NATIONAL WILDLIFE FEDERATION AND PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBIL-ITY, Plaintiffs,

v.

FEDERAL EMERGENCY MANAGEMENT AGENCY, Defendant,

and

National Association of Home Builders, et al., Intervenors–Defendants.

No. C03–2824Z.

United States District Court, W.D. Washington.

Nov. 15, 2004.

Jan Erik Hasselman, National Wildlife Federation (Seattle), Seattle, WA, John F Kostyack, National Wildlife Federation, Mary Randolph Sargent, National Wildlife Federation, Washington, DC, for National Wildlife Federation, Public Employees for Environmental Responsibility, Plaintiffs.

Carter Howell, U.S. Department of Justice, Wildlife and Marine, Resources Section, Washington, DC, Brian C Kipnis, U.S. Attorney's Office (SEA), Seattle, WA, for Federal Emergency Management Agency, Defendant.

Eric S Merrifield, Perkins Coie, Galen G B Schuler, Perkins Coie, Mark W Schneider, Perkins Coie, Seattle, WA, for National Association of Home Builders, County of Mason, Intervenors Defendants.

## ORDER

ZILLY, District Judge.

This matter comes before the Court on cross-motions for summary judgment. For the reasons outlined herein, the Court GRANTS IN PART and DENIES IN PART Plaintiffs' Motion for Summary Judgment, docket no. 30, GRANTS IN PART and DENIES IN PART Federal Defendant's Cross–Motion for Summary Judgment, docket no. 36, and GRANTS IN PART and DENIES IN PART Intervenor Defendants' Motion for Summary Judgment, docket no. 37.

## I. BACKGROUND

### A. The Parties and the Present Action

The National Wildlife Federation ("NWF") and Public Employees for Environmental Responsibility ("PEER") (collectively "Plaintiffs") bring this Endangered Species Act ("ESA") lawsuit against the Federal Emergency Management Agency ("FEMA"), alleging that FEMA has violated Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), by not consulting with the National Marine Fisheries Service ("NMFS") on the impacts of the National Flood Insurance Program ("NFIP") on the Puget Sound chinook salmon, a threatened

species.[1] Plaintiffs contend that FEMA's implementation of the NFIP constitutes an agency action that may affect the Puget Sound chinook salmon because some aspects of the NFIP encourage development in the floodplains, and the floodplains of the Puget Sound provide important habitat for the salmon. Plaintiffs seek three forms of relief: (1) a declaration that FEMA violated Section 7(a)(2) of the ESA, (2) an injunction requiring FEMA to initiate consultation with NMFS on the NFIP's impacts on the Puget Sound chinook salmon,[2] and (3) the Court's retention of jurisdiction over the matter to ensure FEMA's proper implementation of the ESA and governing regulations.

The following entities have intervened as defendants in the action: the National Association of Home Builders ("NAHB"), Skagit County, Island County, the Washington Association of REALTORS, the Home Builders Association of Kitsap County, the Skagit Island Counties Builders Association, and Piazza Construction, Inc. (collectively "Intervenors").

### B. *The National Flood Insurance Program ("NFIP")*

FEMA is the federal agency charged with administering the NFIP, a federal flood insurance program. Congress created the NFIP in 1968 by the National Flood Insurance Act ("NFIA"), 42 U.S.C. §§ 4001 *et seq.*, later amended it by the Flood Disaster Protection Act of 1973, and again amended it in 1994 by the National Flood Insurance Reform Act. AR 116 at 2–4. The purposes of the flood insurance program are to make flood insurance "available on a nationwide basis through the cooperative efforts of the Federal Government and the private insurance industry" and to base flood insurance "on workable methods of pooling risks, minimizing costs, and distributing burdens equitably among those who will be protected by flood insurance and the general public." 42 U.S.C. § 4001(d). Congress further stated that other purposes of the federal flood insurance program are to:

(1) encourage State and local governments to make appropriate land use adjustments to constrict the development of land which is exposed to flood damage and minimize damage caused by flood losses,

(2) guide the development of proposed future construction, where practicable, away from locations which are threatened by flood hazards,

(3) encourage lending and credit institutions, as a matter of national policy, to assist in furthering the objectives of the flood insurance program,

(4) assure that any Federal assistance provided under the program will be related closely to all flood-related programs and activities of the Federal Government, and

(5) authorize continuing studies of flood hazards in order to provide for a constant reappraisal of the flood insurance program and its effect on land use requirements.

42 U.S.C. § 4001(e). The NFIA states that FEMA "shall consult with other de-

---

**1.** Plaintiffs initially claimed that FEMA violated both Section 7(a)(1) and 7(a)(2) of the ESA. Plaintiffs have since requested the Court dismiss with prejudice their claims under Section 7(a)(1). Thus, the sole remaining issue is whether FEMA is required to consult with the NMFS on the NFIP pursuant to Section 7(a)(2) of the ESA for the Puget Sound chinook salmon.

**2.** The injunctive relief sought in Plaintiffs' summary judgment motion is more limited than the injunctive relief sought in Plaintiffs' Complaint, wherein Plaintiffs sought to enjoin the issuance of flood insurance for new development within the geographic range of the Puget Sound chinook salmon until FEMA completed the formal consultation process.

partments and agencies of the Federal Government ... in order to assure that the programs of such agencies and the flood insurance program authorized under this chapter are mutually consistent." 42 U.S.C. § 4024.

The three basic components of the NFIP are: (1) the identification and mapping of flood-prone communities, (2) the requirement that communities adopt and enforce floodplain management regulations that meet certain minimum eligibility criteria in order to qualify for flood insurance, and (3) the provision of flood insurance. AR 116 at 4. As part of the NFIP, FEMA also implements a Community Rating System ("CRS"), which provides discounts on flood insurance premiums in those communities that establish floodplain management programs that go beyond NFIP's minimum eligibility criteria. *Id.* at 31.

Plaintiffs contend that the ESA requires FEMA to consult with NMFS regarding the potential impact of each of these aspects of the NFIP on the Puget Sound chinook salmon. Defendants and Intervenors contend that such consultation is not required because Plaintiffs do not have standing, FEMA does not have discretion to implement measures under the NFIP that inure to the benefit of Puget Sound chinook salmon, and there is no reason to believe that the NFIP may affect Puget Sound chinook salmon.

### 1. *Identification and Mapping of Flood–Prone Communities*

Congress authorized FEMA "to identify and publish information with respect to all flood plain areas, including coastal areas located in the United States, which have special flood hazards" and "to establish or update flood-risk zone data in all such areas, and make estimates with respect to the rates of probable flood caused loss for the various flood risk zones for each of these areas." 42 U.S.C. § 4101(a)(1), (a)(2).

FEMA assesses the flood risk within each flood-prone community [3] by conducting a Flood Insurance Study (a "flood study") that typically employs the use of computer and engineering models and statistical techniques. AR 116 at 6–7. FEMA presents the results of a flood study on a map referred to as a Flood Insurance Rate Map (a "flood map") and also in a narrative format, both of which are subject to public review and an administrative appeals process for any owner or lessee of real property within the community. *Id.* at 7–8. The flood risk information presented on a flood map and in a flood study report forms the technical basis for the administration of the NFIP. *Id.* at 9. For example, a flood map's identification of a property as a Special Flood Hazard Area ("SFHA"), which is land within the floodplain of a community subject to a one percent or greater chance of flooding in any given year, triggers a Mandatory Flood Insurance Purchase Requirement under the NFIP. *Id.* at 3, 9.

The NFIA requires FEMA to review flood maps at least once every five years to assess the need to update all floodplain areas and flood risk zones. 42 U.S.C. § 4101(e), (f)(1). FEMA has promulgated regulations governing the development and revision of flood maps. *See e.g.,* 44 C.F.R. §§ 65.5, 65.6; 44 C.F.R. pt. 72. The boundaries of a SFHA on a flood map can be revised, for example, following man-made alterations within the floodplain, such as the placement of fill. 44 C.F.R. §§ 72.1, 72.2.

---

**3.** Under the NFIA, a "community" means a State or a political subdivision which has zoning and building code jurisdiction over a particular area having special flood hazards. 42 U.S.C. § 4003(a)(1).

### 2. *Minimum Eligibility Criteria*

Congress has authorized FEMA to "develop comprehensive criteria designed to encourage ... the adoption of adequate State and local measures" that will:

(1) constrict the development of land which is exposed to flood damage where appropriate,

(2) guide the development of proposed construction away from locations which are threatened by flood hazards,

(3) assist in reducing damage caused by floods, and

(4) otherwise improve the long-range land management and use of flood-prone areas.

42 U.S.C. § 4102(c) (referred to herein as the "minimum eligibility criteria"). In 1976, FEMA promulgated regulations establishing the minimum eligibility criteria for flood-prone areas, mudslide areas and flood-related erosion areas. 44 C.F.R. §§ 60.3–60.5. The criteria governing flood-prone areas are currently designed to reduce threats to lives and to minimize damages to structures and water systems during flood events, *see* 44 C.F.R. § 60.3; AR 116 at 2, not to protect aquatic habitat, imperiled species, or other environmental values.

Community participation in the NFIP is voluntary, and FEMA does not have any direct involvement in the administration of local floodplain management ordinances. AR 116 at 12. However, communities must adopt regulations consistent with FEMA's minimum eligibility criteria in order to be enrolled in the NFIP. 42 U.S.C. § 4012(c)(2); *cf.* 42 U.S.C. § 4022(a)(1) (prohibiting federal flood insurance to communities that have not complied with the criteria).

### 3. *Provision of Flood Insurance*

Congress authorized FEMA "to establish and carry out a national flood insurance program which will enable interested persons to purchase insurance against loss resulting from physical damage to or loss of real property or personal property related thereto arising from any flood occurring in the United States." 42 U.S.C. § 4011. FEMA must provide flood insurance to communities which have "evidenced a positive interest in securing flood insurance coverage under the flood insurance program" and have "given satisfactory assurance that ... adequate land use and control measures will have been adopted ... which are consistent with the comprehensive criteria for land management and use developed" under 42 U.S.C. § 4102. 42 U.S.C. § 4012(c).

FEMA provides flood insurance through arrangements with private sector property insurance companies (referred to as "Write Your Own" ("WYO") companies), which collect premiums from eligible insureds and, after retaining a portion to cover their costs, submit the remainder to the U.S. Treasury. 44 C.F.R. §§ 62.23, 62.24. Alternatively, FEMA provides flood insurance to insureds using state-licensed property and casualty insurance agents and brokers who deal directly with FEMA. 44 C.F.R. §§ 62.3, 62.4; AR 116 at 22. The NFIP is not the only source of flood insurance, but flood coverage for residential homeowners in particular is difficult to acquire from the private insurance market. AR 116 at 23.

### 4. *Community Rating System ("CRS")*

Congress authorized FEMA "to carry out a community rating system program, under which communities participate voluntarily ... to encourage adoption of more effective measures that protect natural and beneficial floodplain functions," among other goals. 42 U.S.C. § 4022(b)(1). The CRS provides discounts on flood insurance premiums in those communities that establish floodplain management programs that go beyond the NFIP's minimum eligibility criteria. AR 116 at 31; AR 114 at 110–1.

FEMA's CRS manual recognizes that "[f]loodplains perform certain natural and beneficial functions that cannot be duplicated elsewhere," such as "provid[ing] habitat for diverse species of flora and fauna, some of which cannot live anywhere else." AR 114 at 110–5. The CRS specifically provides incentives to protect areas designated as critical habitat for endangered species and for areas covered by Habitat Conservation Plans under the Endangered Species Act. *Id.* at 420–9. However, because fish enhancement goals and flood risk reduction goals are sometimes conflicting, the CRS also rewards activities that are detrimental to floodplains and aquatic species, for example, through its recognition of paved parking lots and roads as "open space," and through its encouragement of structural flood control projects such as levees, berms and floodwalls. *Id.* at 420–2, 530–2.

### 5. *FEMA's Oversight of Community Participation in the NFIP*

FEMA monitors communities to ensure that they have adopted an ordinance that meets or exceeds the NFIP's minimum eligibility criteria and to ensure that they are effectively enforcing the ordinance. AR 116 at 17. If communities do not adequately enforce their floodplain management regulations, they can be placed on probation and potentially suspended from the NFIP. *Id.* at 17–18; 44 C.F.R. § 59.24(b), (c). FEMA, or States on behalf of FEMA, visit NFIP communities to conduct comprehensive assessments of communities' floodplain management programs, to provide technical assistance, and to identify any deficiencies in the local programs. AR 116 at 17; AR 101 (Community Compliance Program Guidance); AR 102 (Guidance for Conducting Community Assistance Contacts and Community Assistance Visits). Since 1999, FEMA has visited approximately 35 of the 110 communities in the Puget Sound area that are enrolled in the NFIP to monitor their compliance with the NFIP requirements. AR 118; AR 119.

### C. *The NFIP and Development*

Plaintiffs assert that the NFIP contributes to an increase in development in the floodplains. In support, Plaintiffs point out that the NFIP is premised on the congressional finding that "the availability of Federal loans, grants, guaranties, insurance, and other forms of financial assistance are often determining factors in the utilization of land and the location and construction of public and of private industrial, commercial, and residential facilities." 42 U.S.C. § 4002(a)(2). The Final Environmental Impact Statement ("FEIS") for FEMA's NFIA regulations states that "[i]f a community chooses not to participate in the [NFIP], economic development in the flood hazard area may be severely restricted." AR 100 at 63. The FEIS goes on to say that "[g]enerally, the withdrawal of any form of Federal financial assistance for the acquisition or construction of buildings in the flood hazard area will eliminate sources of money and thereby have a strong tendency to decrease economic growth.... It appears that the amount of money available from non-federally related financial intermediaries is limited." *Id.; see also* 42 U.S.C. § 4012a (prohibiting any federally regulated bank or lender, or federal agency from offering loans or other financial assistance for acquisition or construction purposes to persons in non-NFIP communities); 42 U.S.C. § 5154a(a) (making disaster relief unavailable to non-NFIP communities that suffer from floods).

The declarations of Intervenors in support of their motion to intervene demonstrate the close connection between the availability of federal flood insurance and floodplain development in the Puget Sound region. The Washington Association of REALTORS represented that "the inabili-

ty to obtain NFIP [insurance] would effectively shut down new housing in affected areas" because "[m]ost real estate purchasers cannot purchase property without obtaining financing, and in areas where it applies, flood insurance is a prerequisite to obtaining financing." Stout Decl., docket no. 17, ¶ 3. Similarly, Piazza Construction, Inc. contends that financing for its construction projects is contingent on obtaining flood insurance, and that flood insurance for past projects has been provided through the NFIP. Piazza Decl., docket no. 14, ¶¶ 5–7. The Home Builders Association of Kitsap County also noted that its approximately 560 builder and developer members rely on the NFIP to obtain financing for their construction projects. Castle Decl., docket no. 15, ¶¶ 2, 5.

### D. *Impact of Floodplain Development on Salmon Habitat*

The Administrative Record[4] contains evidence generated by FEMA itself regarding the importance of protecting the natural functions of floodplains to healthy salmon habitats and, conversely, the negative impacts of development in the floodplains on fish and wildlife. For example, in support of its Model Ordinance for flood loss reduction and fish habitat enhancement, FEMA states that "it is clear that good stewardship of floodplains can be an extremely important factor in protecting habitat for fish" and that a functioning floodplain is "a specific habitat element necessary to be maintained, protected or restored in order for wild salmon to continue to exist and evolve." AR 28 at 4–5. FEMA has also recognized that "[m]ost development and human disturbance of floodplains inhibits the ability of the floodplain to perform its vital functions," such as "maintaining water quality and retarding runoff." AR 106 at 12. "Excessive sediment can clog streams and rivers and have a harmful effect on ... the living and breeding grounds of many species, including fish...." *Id.*

On the subject of filling in the floodplain, FEMA has stated that "[f]loodplains provide critical habitat for fisheries resources and it is highly likely filling in the floodplain would have the potential for adverse impacts to listed species and/or habitat." AR 61 at 1. FEMA has also recognized that "filling in the flood fringe (which is legal and accepted in the NFIP) has many detrimental effects," including "a negative effect on fish (and wildlife) habitat." AR 7 at 1. In a document entitled "ESA–NFIP Compliance: Summary Strategy," FEMA acknowledged that "since floodplains provide critical habitat for fish, it is likely that filling would be considered a 'take'" under the ESA.[5] AR 11 at 1. FEMA also "antici-

---

**4.** The Court does not consider the declarations of Wald and Steward in evaluating Plaintiffs' argument that increased development in the floodplains affects salmon habitat because these declarations constitute extra-record evidence pertinent to FEMA's decision not to consult with NMFS. While the Court may consider extra-record evidence for background information, it may not consider such evidence to determine the correctness or wisdom of the agency's decision. *See Pacific Coast Fed'n of Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.,* 71 F.Supp.2d 1063, 1066 (W.D.Wash.1999) (citing *Asarco, Inc. v. United States Envtl. Prot. Agency,* 616 F.2d 1153, 1158 (9th Cir.1980)). Thus, although the Court does consider these declarations for standing purposes, the Court does not consider them in determining the correctness of the agency's decision.

**5.** The ESA prohibits the "taking" of an endangered or threatened species. 16 U.S.C. § 1538(a)(1)(B), (a)(1)(C); 50 C.F.R. §§ 17.21(c), 17.31(a). "The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). "Harm" is further defined as including "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering." 50 C.F.R.

pated that filling activities in the floodplain will be severely limited due to the ESA listing." *Id.* at 2.

### E. *No Formal Consultation*

FEMA does not contend that it has formally consulted with NMFS over the NFIP's impacts on the Puget Sound chinook salmon. In its Answer to Plaintiffs' complaint, FEMA asserts that it has engaged in *informal* consultation with NMFS. Answer, docket no. 11, ¶ 36. "Informal consultation" is a voluntary process that includes all discussions and correspondence between the consultation agency and the action agency and is designed to assist the action agency in determining whether formal consultation is required. 50 C.F.R. § 402.13(a). Informal consultation is not a substitute for formal consultation.

## II. *DISCUSSION*

### A. *Standard of Review*

Plaintiffs, FEMA and the Intervenors, have separately cross-moved for summary judgment, docket nos. 30, 36 and 37, respectively. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). On cross-motions for summary judgment, the Court must consider each party's motion separately and determine whether that party is entitled to summary judgment under Rule 56. *W. Land Exch. Project v. United States BLM*, 315 F.Supp.2d 1068, 1075 (D.Nev. 2004). In making these determinations, the Court must evaluate the evidence offered in support of each cross-motion, *Fair*

*Hous. Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136–37 (9th Cir.2001), and must consider the motion with all reasonable inferences favoring the non-moving party. *Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1111 (9th Cir. 2001).

Plaintiffs bring this action under the citizen suit provision of the ESA. *See* 16 U.S.C. § 1540(g)(1)(A). The ESA's citizen-suit provision does not contain an internal standard of review. *Id.* Thus, judicial review of the ESA is governed by Section 706 of the Administrative Procedures Act ("APA"), 5 U.S.C. § 706. *Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv.*, 340 F.3d 969, 973 (9th Cir.2003); *Envtl. Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073, 1078 (9th Cir.2001); *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 981 (9th Cir.1985); *False Pass v. Clark*, 733 F.2d 605, 609–10 (9th Cir.1984). Under the APA, a court may only set aside an agency action if it determines that the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D); *Simpson Timber*, 255 F.3d at 1078.

### B. *Standing*

#### 1. *Rules of Law*

FEMA and the Intervenors [6] argue that Plaintiffs have failed to establish standing under Article III of the United States Constitution. "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires

§ 17.3; *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Oregon*, 515 U.S. 687, 691, 708, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995).

6. The Order hereinafter refers to the moving party on the standing issue as the "Intervenors," with the understanding that FEMA has joined the Intervenors' standing argument.

the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc. ("Laidlaw")*, 528 U.S. 167, 181, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (citing *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)). The Intervenors have not argued that Plaintiffs' members cannot meet the second and third prerequisites to standing. In light of the environmental interests Plaintiffs seek to protect and the injunctive nature of the relief sought, the second and third prerequisites are easily met here. *See Citizens for Better Forestry v. United States Dep't of Agriculture*, 341 F.3d 961, 976 (9th Cir. 2003). The issue in the present case is whether NWF's and PEER's members have standing to sue in their own right.

■ "The question of standing involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Bennett v. Spear*, 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). The APA limits the exercise of jurisdiction to cases where: (1) there has been a final agency action adversely affecting the plaintiff, and (2) the plaintiff's injury falls within the zone of interests of the statutory provision the plaintiff claims was violated. *Citizens for Better Forestry*, 341 F.3d at 976. However, these APA requirements do not apply to suits brought under the ESA's broad citizen suit provision, 16 U.S.C. § 1540(g)(1)(A), which provides that "any person may commence a civil suit . . . to enjoin any person . . . who is alleged to be in violation of any provision of this chapter or regulation." *See Bennett*, 520 U.S. at 162–65, 117 S.Ct. 1154 (rejecting zone of interests test); *Inst. for Wildlife Prot. v. Norton*, 303 F.Supp.2d 1175, 1180 (W.D.Wash.2003) ("[I]f the Court conducts its review under the ESA, the issue of . . . final agency action is irrelevant."); *Washington Toxics Coalition v. Envtl. Protec-*

*tion Agency*, Case No. C01–132, at 10 (W.D.Wash.2002) (not applying the APA's final agency action requirement to ESA Section 7(a)(2) claim). Thus, standing under the ESA has been expanded to the full extent permitted under Article III. *See Bennett*, 520 U.S. at 165–66, 117 S.Ct. 1154.

■ "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Laidlaw*, 528 U.S. at 180–81, 120 S.Ct. 693 (citing *Lujan v. Defenders of Wildlife ("Lujan v. DOW")*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). As the party invoking federal jurisdiction, Plaintiffs bear the burden of establishing these elements. *See Lujan v. DOW*, 504 U.S. at 561, 112 S.Ct. 2130. To support each element at the summary judgment stage of the proceedings, Plaintiffs must set forth by affidavit or other evidence specific facts, which for purposes of standing will be taken to be true. *See id.*

### 2. *Plaintiffs' Affidavits*

In support of standing, Plaintiffs have submitted affidavits of three NWF members and one PEER member, all of whom are residents in the Puget Sound area. Thea Levkovitz, a NWF member from Sammamish, observes, enjoys, and is inspired by salmon in the rivers and creeks of Puget Sound, such as Issaquah Creek, and watches the salmon, including chinook salmon, migrating through the Ballard Locks at least once a year. Levkovitz Decl., docket no. 24, ¶¶ 1, 7–8. The harm to salmon habitat, and diminishing salmon runs, reduces the opportunities she has to

interact with chinook salmon and to share this experience with her family and friends. *Id.* ¶ 11. She declares that "FEMA could help reduce the impacts of development on salmon habitat in Puget Sound." *Id.* ¶ 12. She further declares that "if FEMA properly complied with its legal obligations, my injury would be lessened." *Id.*

Paula J. Del Giudice, a NWF member from Sammamish, views and photographs chinook salmon migrating and spawning in Puget Sound creeks and streams, such as Bear Creek, as well as the Ballard Locks, and has hiked and camped along floodplain areas in the Puget Sound area. Del Giudice Decl., docket no. 25, ¶¶ 1, 6–8. She has taken her children out to see salmon migrating and spawning. *Id.* ¶ 6. Her life will be less enjoyable if salmon habitat in Puget Sound continues to be altered or degraded by development. *Id.* ¶ 9. She declares that FEMA "is responsible for authorizing and/or encouraging development in floodplains in Puget Sound, and thus, for harming salmon habitat." *Id.* ¶ 10. She further states that "[i]f the defendant in this case was to stop authorizing development, or alter its authorizations to protect and preserve habitat, salmon would have a better chance at recovering, and the harm imposed on me by habitat destruction would be reduced." *Id.*

K. Robert Johnson, a NWF member from Renton, has enjoyed fishing for chinook salmon in and around Puget Sound regularly for about 23 years. Johnson Decl., docket no. 26, ¶¶ 1, 3–5. Since chinook salmon are increasingly threatened by urbanization and development, there have been fewer and fewer fishing opportunities for him to enjoy. *Id.* ¶¶ 5, 11. For example, he can no longer fish in one of his favorite places off Whidbey Island because of regulations intended to protect chinook salmon. *Id.* ¶¶ 5–8. He also de-

rives great satisfaction from seeing salmon swimming in the water and simply knowing that they are there. *Id.* ¶ 10. He declares that "[d]estruction of habitat has been one of the chief causes of the sharp decline of chinook ... [t]herefore, destruction of habitat injures me." *Id.* ¶ 11. He further notes that "[i]f federal and local agencies took greater care about where and how they authorized development and ... considered the needs of salmon like chinook in their planning decisions, salmon wouldn't be in the dire situation that they are now in." *Id.* ¶ 12.

Robert E. Jacobs, a PEER member from Olympia and the former Mayor of Olympia, regularly observes salmon, including chinook salmon, in Puget Sound creeks, such as Kennedy Creek and Moxlie Creek. Jacobs Decl., docket no. 27, ¶¶ 2, 6–7. He is harmed by "careless development in Puget Sound that lessens water quality, destroys salmon habitat, and undermines salmon survival." *Id.* ¶ 10. He declares that "[i]f agencies ... took greater care about where and how they developed land for human use, the environment would be healthier, fish could be restored, and I would be happier." *Id.*

### 3. *Injury In Fact*

■ To satisfy the first "injury in fact" element of standing, environmental plaintiffs must aver that they use the affected area and are persons "for whom the aesthetic and recreational values of the area will be lessened" by the challenged activity. *Laidlaw,* 528 U.S. at 183, 120 S.Ct. 693 (quoting *Sierra Club v. Morton,* 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)); *see also Lujan v. DOW,* 504 U.S. at 562–63, 112 S.Ct. 2130 ("Of course, the desire to use or observe an animal species, even for purely [a]esthetic purposes, is undeniably a cognizable interest for purposes of standing.");[7] *Ocean Advocates v.*

---

7. The injury in fact test requires more than an

injury to a "cognizable interest" by also re-

*U.S. Army Corps of Eng'rs,* 361 F.3d 1108, 1119 (9th Cir.2004) (establishing " 'injury in fact' by showing a connection to the area of concern sufficient to make credible the contention that the person's future life will be less enjoyable ... if the area in question remains or becomes environmentally degraded."). Plaintiffs' affidavits are sufficient to show injury in fact because Plaintiffs aver that they regularly live in and use the affected Puget Sound area, observing, photographing and fishing for chinook salmon on specific creeks and waterways. They also aver that their concrete interests are injured by the increasingly limited opportunities for interacting with chinook salmon caused by development of the floodplains and the attendant destruction of salmon habitat.

Injury in fact is alternatively established by the fact that FEMA has failed to carry out statutorily-mandated procedures in a manner that impairs Plaintiffs' concrete interests in the conservation and recovery of the Puget Sound chinook salmon. *See Florida Key Deer v. Stickney,* 864 F.Supp. 1222, 1224–25 (S.D.Fla.1994) (granting plaintiffs standing to challenge FEMA's failure to consult with FWS on impacts of FEMA's administration of the NFIP on the endangered Key deer) (citing *Thomas v. Peterson,* 753 F.2d 754, 764 (9th Cir. 1985) ("Irreparable damage is presumed to flow from ... procedural violations of the ESA.")). In 1992, the United States Supreme Court made it clear that a procedural violation alone would not confer standing upon an individual; however, an individual can enforce procedural rights if the procedures in question are designed to protect some threatened concrete interest of his. *Lujan v. DOW,* 504 U.S. at 573 n. 8, 112 S.Ct. 2130. Injury in fact is established in the present case because the Section 7(a)(2) procedures are designed to prevent agency actions from jeopardizing listed species, including the threatened Puget Sound chinook salmon in which Plaintiffs have demonstrated a concrete interest.

#### 4. *Causation*

The second "causation" element of standing "is only implicated where the concern is that an injury caused by a third party is too tenuously connected to the acts of the defendant." *Citizens for Better Forestry,* 341 F.3d at 975. "The causal connection put forward for standing purposes cannot be too speculative, or rely on conjecture about the behavior of other parties, but need not be so airtight at [the summary judgment] stage of litigation." *Ocean Advocates,* 361 F.3d at 1120; *see also Nat'l Audubon Soc'y v. Davis,* 307 F.3d 835, 849 (9th Cir.2002), *amended,* 312 F.3d 416 (2002) (holding that length of chain of causation is not the issue, but rather the plausibility of the links that comprise the chain).[8] The injury must be

---

quiring that the party seeking review be himself among the injured. *See Lujan v. DOW,* 504 U.S. at 563, 112 S.Ct. 2130. The affiants, who live and use the Puget Sound waterways, have demonstrated that they are among the injured, in contrast to the plaintiffs in *Lujan v. DOW* whose " 'some day' intentions" to visit endangered species halfway around the world were insufficient to show the "actual or imminent" injury in fact. *See id.* at 564.

**8.** The Plaintiffs argue that their burden of proving causation when seeking to assert a "procedural right" is light. Pls.' Response/Reply at 23. While this burden may be light, it is not non-existent. As the Court in *Washington Toxics Coalition v. Envtl. Protection Agency,* held, the plaintiff must prove that the "procedural breach will cause the injury essential to the plaintiff's own interest." Case No. C01–132, at 12 (W.D.Wash. 2002) (quoting *Fla. Audubon Soc'y v. Bentsen,* 94 F.3d 658, 664–65 (D.C.Cir.1996)). The plaintiff must demonstrate that the defendant caused the particularized injury, not just the procedural violation. *Fla. Audubon Soc'y,* 94 F.3d at 664–65.

"fairly traceable to the challenged action of the defendant." *Laidlaw,* 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). In *Ocean Advocates,* the link between a dock extension and increased tanker traffic and, as a result, the risk of an oil spill was "not tenuous or abstract" either considered alone or in tandem with other industrial projects where the parties agreed that the dock extension would lead to increased traffic over time, even though other factors would also cause additional tanker traffic and would increase the risk of an oil spill. 361 F.3d at 1120. In *Nat'l Audubon Soc'y v. Davis,* the injury to birds was held to be "fairly traceable" to a ban on the use of leghold traps because the removal of the traps would likely lead to a larger population of predators, which in turn would decrease the number of birds. 307 F.3d at 849. However, in *Bell v. Bonneville Power Admin. ("BPA"),* a payment made by BPA to third parties to amend a contract to reduce the amount of power BPA was required to supply was not sufficient to prove that the contract enabled the third parties to stay in business when no facts other than the fact of payment were given to demonstrate causation. 340 F.3d 945, 951 (9th Cir.2003).

■ The Intervenors and FEMA argue that Plaintiffs have failed to establish a causal connection between FEMA's implementation of the NFIP and development that may affect the Puget Sound chinook salmon. They emphasize that FEMA does not directly authorize development. The Court rejects this argument as stated by the Fifth Circuit:

Although ... causation is not proven if the injury complained of is the result of the independent action of some third party not before the court, this does not mean that causation can be proven only if the governmental agency has coercive control over those third parties. Rather, the relevant inquiry in this case is whether the [governmental agency] has the ability through various programs to affect the [ ] decisions of those third part[ies] to such an extent that the plaintiff's injury could be relieved.

*Sierra Club v. Glickman,* 156 F.3d 606, 614 (5th Cir.1998) (internal citations and quotations omitted). The Ninth Circuit has similarly held that "third party involvement does not render the relief sought completely speculative," especially if Congress and the agency have acknowledged a relationship between the agency's action and the actions of a third party. *Alaska Ctr. for the Env't v. Browner,* 20 F.3d 981, 985 (9th Cir.1994). Here, Congress acknowledged in the NFIA that insurance can be a "determining factor" in the utilization of land and the location and construction of public and private development. *See* 42 U.S.C. § 4002(a)(2). Likewise, FEMA acknowledged in the FEIS for NFIP regulations that communities that do not participate in the NFIP may experience "severely restricted" economic development. AR 100 at 63. Thus, even though FEMA does not directly authorize development, Congress and FEMA have both recognized a connection between the NFIP and development in the floodplains such that the causal connection is not too tenuous or abstract for standing purposes.

The Intervenors also argue that Plaintiffs cannot have standing because they have not identified specific actions by FEMA that have, in turn, led to increased development. In fact, specific actions by FEMA in implementing NFIP may cause damage to endangered chinook salmon by encouraging development and fill in floodplains. FEMA engages in four central activities: (1) mapping; (2) developing minimum eligibility criteria which communities must use to develop their flood management regulations in order to be eligible for NFIP; (3) selling flood insurance; and (4) developing a community rating system

to provide communities with discounted flood insurance premiums if they adopt flood management regulations which exceed FEMA's minimum eligibility criteria. Each of these different activities could potentially cause damage to the threatened Puget Sound chinook salmon.

FEMA's flood insurance maps are used approximately 15 million times each year for developing State and community floodplain management regulations, for calculating flood insurance premiums, and for determining whether property owners must obtain flood insurance as a condition to receiving mortgage loans or other financial assistance. AR 116 at 4. FEMA has promulgated regulations governing the development and revision of flood maps. *See, e.g.,* 44 C.F.R. §§ 65.5, 65.6; 44 C.F.R. pt. 72. These regulations permit the boundaries of SFHAs on a flood map to be revised following man-made alterations to the floodplain, such as the placement of fill. 44 C.F.R. §§ 72.1, 72.2. Individual property owners who have filled the floodplain can petition FEMA to have their property removed from a flood area through a Letter of Map Revision based on Fill ("LOMR–F"). AR 116 at 9. Once property is removed from the floodplain it is no longer necessary for the property developer to comply with the community's floodplain management regulations. *See* AR 116 at 13. By allowing individuals to remove their property from regulation by artificially filling it, FEMA is in effect encouraging filling. The declaration of Alan Wald, docket no. 30(2), connects filling to the destruction of salmon habitat. Wald notes that the filling of floodplains can result in destruction of wetlands, vegetation and habitats and "floodwaters dis-placed by fill increase velocity and erosive damage and scour fish habitat downstream." Wald Decl. ¶¶ 18–19. FEMA itself acknowledges that filling in the floodplain is highly likely to have negative effects on habitat of listed and endangered species. AR 61 at 1. Thus the mapping regulations promulgated by FEMA in implementing NFIP have a direct causal link to the alleged destruction of salmon habitat and the Plaintiffs' injury.

FEMA's promulgation of minimum eligibility criteria and its sale of flood insurance both enable development in the floodplain that negatively impacts salmon. As the Intervenors note in declarations supporting their motion to intervene, most lending institutions require flood insurance as a prerequisite to project financing, making NFIP insurance a prerequisite to development in the floodplain. Castle Decl. ¶ 5; Piazza Decl. ¶ 5; Desiderio Decl., docket no. 16, ¶ 6. The Court disregards as disingenuous the Intervenors' argument that the provision of flood insurance decreases the rate of human development in the floodplain.[9] In order to become eligible for NFIP insurance, local communities must adopt floodplain management ordinances that are consistent with FEMA's minimum eligibility criteria. 42 U.S.C. § 4012(c)(2). FEMA's minimum eligibility criteria, which guide development in the floodplain, are primarily designed to lessen flood property damage and do not mention preserving the habitat of endangered species. 44 C.F.R. § 60.3. Floodplain development, in turn, reduces the amount of habitat available to chinook salmon and creates additional impermeable surfaces in the floodplain that produce polluting run-

9. Of course, the designation of a parcel of land within a floodplain would reduce the likelihood of its development as compared to land outside of the floodplain; however, Plaintiffs are not complaining about FEMA's overzealous designation of areas as being within the floodplain. Rather, Plaintiffs are complaining, among other things, about FEMA's under-designation of areas as being within the floodplain and FEMA's fill regulations that allow areas to be "de-designated" as being within the regulated floodplain.

off. AR 5 at 22. Pollution and reduced habitat impact the numbers of surviving chinook salmon. AR 1 at 27–28. The Wald declaration and the declaration of Cleveland R. Steward III, docket no. 30(3), also provide evidence of the importance of floodplains to salmon and the threat posed to salmon by human development in the floodplain. Wald Decl. ¶¶ 10, 13; *see generally* Steward Decl. ¶¶ 22–52. The causal connection between the promulgation of FEMA's minimum eligibility criteria, the provision of flood insurance, and development which harms chinook salmon in the Puget Sound is not "tenuous or abstract" and is strong enough to support standing. *See Ocean Advocates*, 361 F.3d at 1120.

Finally, FEMA's development of the CRS is causally linked to the Plaintiffs' injury. FEMA uses the CRS to provide discounts on flood insurance to local communities that establish flood control measures beyond the minimum eligibility criteria. AR 116 at 31–32; AR 114 at 110–1. The CRS encourages some activities that are harmful to salmon, such as the removal of large woody debris from rivers. Wald Decl. ¶ 26. The CRS also impacts salmon habitat through its recognition of paved parking lots and roads as "open space," and its encouragement of structural flood control projects such as levees, berms and floodwalls. AR 114 at 420–2, 530–2.

As a result, the Court concludes that Plaintiffs have provided sufficient evidence showing that the injury to salmon caused by third party developers of floodplains is not too tenuously connected to the acts of FEMA in implementing the NFIP. The present case is analogous to the Ninth Circuit cases of *Ocean Advocates* and *National Audubon Society*, described above,

in which the plaintiffs had demonstrated a plausible chain of causation between FEMA's actions and the plaintiffs' injury.[10]

### 5. *Redressability*

The third standing inquiry, "redressability," requires a court to determine whether it possesses the ability to remedy the harm that a petitioner asserts. *Citizens for Better Forestry*, 341 F.3d at 975–76. "A petitioner who asserts inadequacy of a government agency's environmental studies need not show that further analysis by the government would result in a different conclusion." *Id.* at 976 (internal quotations and citations omitted). "It suffices that the agency's decision *could be influenced* by the environmental considerations that the relevant statute requires an agency to study." *Id.* (emphasis in original). This Court has previously held that "[a] substantive or procedural violation of the ESA gives rise to a legally redressable injury." *Greenpeace v. Nat'l Marine Fisheries Serv.*, 80 F.Supp.2d 1137, 1151 (W.D.Wash. 2000). For environmental plaintiffs asserting a procedural remedy, redressability is an "undemanding burden" to meet. *See Ocean Advocates*, 361 F.3d at 1120. Indeed, " 'procedural rights' are special: The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *Lujan v. DOW*, 504 U.S. at 572 n. 7, 112 S.Ct. 2130.

The Intervenors argue that Plaintiffs cannot establish redressability because FEMA's actions in implementing the NFIP are not discretionary actions requiring consultation. This argument is an improper attempt to require Plaintiffs to be successful on the merits of their claim to

---

10. See *also Florida Key Deer*, 864 F.Supp. at 1226 (holding that the plaintiffs had met the causation element by showing that there is a "substantial likelihood" that the actions of FEMA in administering and implementing the NFIP in Key deer habitat facilitates, encourages, or makes development more likely than would be the case without flood insurance, either directly or indirectly).

establish standing. *See Laidlaw,* 528 U.S. at 181, 120 S.Ct. 693 (rejecting argument that would raise the standing hurdle higher than the necessary showing for success on the merits); *Citizens for Better Forestry,* 341 F.3d at 971 n. 5 ("A contrary rule [that denied standing] would allow only successful environmental plaintiffs to bring their claims."). The "discretion" issue is more appropriately addressed in evaluating the merits of Plaintiffs' claim that the ESA requires FEMA to formally consult with NMFS with respect to FEMA's implementation of the NFIP.

■ "When deciding whether the plaintiff has standing to maintain the action, the court ordinarily will assume that it has the ability to grant the relief that the plaintiff seeks." *Bonnichsen v. United States Dep't of Army,* 969 F.Supp. 628, 633 (D.Or. 1997). Accordingly, Plaintiffs' have a legally redressable injury because the harm to their interests in the Puget Sound chinook salmon can be redressed by requiring FEMA to recognize its obligations under the ESA to initiate formal consultation with NMFS on the NFIP's impacts on the Puget Sound chinook salmon.

### 6. Programmatic Challenge

■ The Intervenors rely on *Lujan v. National Wildlife Federation ("NWF"),* 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (*"Lujan v. NWF"*), to argue that Plaintiffs do not have standing because they may not seek "programmatic relief" in their current suit. This reliance is misplaced as *Lujan v. NWF* is distinguishable from the present action. The action in *Lujan v. NWF* was brought under the APA, not, as is the current case, under the citizen suit provision of the ESA. *Id.* at 882, 110 S.Ct. 3177. Under the APA, plaintiffs may seek review of a "final agency action" *or* an agency action made reviewable by statute. 5 U.S.C. § 704. The Supreme Court in *Lujan v.*

*NWF* analyzed whether the disparate operations of the Bureau of Land Management ("BLM") in managing land were a "final agency action" as defined by the APA and found that these wide-ranging operations (described as a "program" by the plaintiffs) were not. *Id.* at 890, 110 S.Ct. 3177. The Supreme Court's holding that the program in *Lujan v. NWF* was not a final agency action under the APA has no bearing on whether a program can be an agency action under the ESA: the laws define "action" differently. 5 U.S.C. § 551(13) (defining "agency action" under the APA as including "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act"); 50 C.F.R. § 402.02 (defining agency "action" for the purposes of the ESA as "all activities or programs of any kind authorized, funded, or carried out, in whole or in part" by the relevant agency). The definition of agency action is broader under the ESA than under the APA and specifically includes "program(s)." *Id.* Additionally, that Plaintiffs' Section 7(a)(2) claim addresses the implementation of the NFIP at the programmatic level rather than at a site-specific level does not undermine Plaintiffs' showing of standing because "environmental plaintiffs have standing to challenge not only site-specific plans, but also higher-level, programmatic rules that impose or remove requirements on site-specific plans." *Citizens for Better Forestry,* 341 F.3d at 975. Therefore, programmatic relief is available under the ESA's citizen suit provision, regardless of whether such relief is available when a claim is brought solely under the APA.

### 7. *Conclusion on Issue of Standing*

Having satisfied the three elements of standing and the requirements of associational standing, the Court holds that Plaintiffs have standing to bring this ESA action against FEMA.

### C. The Merits of Plaintiffs' Section 7(a)(2) Endangered Species Act Claim

#### 1. Overview of ESA and Section 7(a)(2)

The Endangered Species Act ("ESA") was enacted in 1973 to prevent the extinction of fish, wildlife, and plant species that have been so depleted in numbers that they are in danger of, or threatened with, extinction. 16 U.S.C. § 1531(a), (b); *see generally Tennessee Valley Auth. ("TVA") v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). In the ESA, Congress declared it "to be the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes" of the ESA. 16 U.S.C. § 1531(c). "[T]he legislative history undergirding [Section] 7 reveals an explicit congressional decision to require agencies to afford first priority to the declared national policy of saving endangered species" and "a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies." *TVA v. Hill,* 437 U.S. at 185, 98 S.Ct. 2279.

The responsibility for the administration and enforcement of the ESA lies with the Secretaries of Commerce and Interior, who have delegated the responsibility to the National Marine Fisheries Service ("NMFS") with respect to marine species, including anadromous salmon, and to the U.S. Fish and Wildlife Service ("FWS") with respect to terrestrial and freshwater species. *See* 50 C.F.R. § 402.01(b).

Plaintiffs bring this lawsuit under Section 7(a)(2) of the ESA, which provides, in pertinent part:

> Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an 'agency action') is not likely to jeopardize the continued existence[11] of any endangered species or threatened species.[12]

16 U.S.C. § 1536(a)(2).[13] Regulations implementing the consultation procedures are codified at 50 C.F.R. pt. 402.

Section 7(a)(2) imposes a procedural duty on the "action agency" to consult with the "consultation agency" (i.e., either FWS or NMFS) if the agency's action "may affect" a listed species. 50 C.F.R. § 402.14(a); *Turtle Island Restoration Network,* 340 F.3d at 974; *Pacific Rivers Council v. Thomas,* 30 F.3d 1050, 1054 n. 8 (9th Cir.1994).[14] However, no formal con-

---

**11.** An action may "jeopardize the continued existence" of a species if it "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

**12.** A "threatened species" "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range," 16 U.S.C. § 1532(20), whereas an "endangered species" "is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). NMFS listed the Puget Sound chinook salmon as "threatened" under the ESA

in 1999. AR 5 (64 Fed.Reg. 14,308 (Mar. 24, 1999)).

**13.** Section 7(a)(2) also requires formal consultation if an agency action may adversely affect the designated "critical habitat" of a listed species. 16 U.S.C. § 1536(a)(2). This provision does not apply here because NMFS, pursuant to a settlement agreement with NAHB in another lawsuit, withdrew its critical habitat designation for the Puget Sound chinook salmon in September 2003 and is currently working on a new designation. AR 41, 45, 46.

**14.** Section 7(a)(2) also imposes a substantive duty on federal agencies to ensure that their

sultation is required if, as a result of the preparation of a biological assessment under 50 C.F.R. § 402.12 [15] or as a result of informal consultation with the Service under 50 C.F.R. § 402.13, the action agency determines, with the consultation agency's written concurrence, that the proposed action may affect but "is not likely to adversely affect" the listed species. 50 C.F.R. § 402.14(b)(1). [16] If no such concurrence is reached between the action agency and the consultation agency, the regulations require that formal consultation be undertaken. *See* 50 C.F.R. § 402.13(a); *Pacific Rivers Council*, 30 F.3d at 1054 n. 8.

The action agency initiates formal consultation through a written request to the consultation agency. 50 C.F.R. § 402.14(c). As part of the formal consultation process, the consultation agency prepares a biological opinion to determine whether the action is likely to jeopardize the continued existence of a listed species. 50 C.F.R. § 402.14(g)(4), (h)(3). If a jeopardy finding is made, the consultation agency will describe "reasonable and prudent alternatives" that the agency can take to avoid a likelihood of jeopardy. 50 C.F.R. § 402.14(g)(5), (h)(3). The consultation agency will also address any inci-

dental take that might occur as a result of the action. 50 C.F.R. § 402.14(g)(7), (i). Formal consultation is terminated with the issuance of the biological opinion. 50 C.F.R. § 402.14(1)(1).

### 2. *Analysis of Plaintiffs' Section 7(a)(2) Claim*

NMFS has jurisdiction over the Puget Sound chinook salmon. *See* 50 C.F.R. § 223.102(a)(16). Section 7(a)(2) imposes a procedural duty on FEMA to initiate formal consultation with NMFS if any action authorized, funded, or carried out by FEMA "may affect" a listed species. *See* 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). FEMA has not initiated formal consultation with NMFS regarding its implementation of the NFIA. [17] FEMA and the Intervenors argue that formal consultation is not required because: (1) the NFIP is not a discretionary "agency action" subject to Section 7(a)(2) of the ESA, and (2) Plaintiffs have failed to demonstrate that FEMA's implementation of the NFIP "may affect" the Puget Sound chinook salmon.

### a. *Discretionary "Agency Action"*

The first issue is whether the implementation of the NFIP—including the identification and mapping of flood-prone

actions are not likely to jeopardize the continued existence of a listed species or adversely affect the critical habitat. 16 U.S.C. § 1536(a)(2). This case is focused, however, on the procedural duty of FEMA to consult with NMFS.

**15.** A biological assessment is not required here because the agency action is not a "major construction activity." 50 C.F.R. § 402.12(b); 50 C.F.R. § 402.02.

**16.** A finding of "not likely to adversely affect" can be made only if the effects of the proposed action on the listed species are expected to be "discountable, or insignificant, or completely beneficial." Hasselman Decl., docket no. 30, Ex. 11 (U.S. FWS and NMFS, *Endangered Species Consultation Handbook:*

*Procedures For Conducting Consultation and Conference Activities Under Section 7 of the Endangered Species Act* (March 1998) at 3–12).

**17.** Even if FEMA did engage in "informal consultation" with NMFS regarding the implementation of the NFIP, as asserted in FEMA's Answer to Plaintiffs' Complaint (¶ 36), there is no evidence in the record that FEMA determined, with NMFS's written concurrence, that the NFIP may affect but "is not likely to adversely affect" the listed species. As noted above, such concurrence is required to release FEMA of its duty to formally consult, assuming that the implementation of the NFIP is an "agency action" that "may affect" the Puget Sound chinook salmon.

communities, the promulgation of regulations outlining minimum eligibility criteria, the provision of flood insurance, and the implementation of the CRS—constitutes "agency action" implicating the ESA. Section 7(a)(2) states that it applies to "any action authorized, funded, or carried out by [a Federal] agency." 16 U.S.C. § 1536(a)(2). The regulations implementing Section 7(a)(2) similarly define "[a]ction" to mean "all activities or *programs* of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas." 50 C.F.R. § 402.02 (emphasis added). "Examples include, but are not limited to: ... (b) the promulgation of regulations; (c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or (d) actions directly or indirectly causing modifications to the land, water, or air." *Id.*

The NFIP is a program carried out by FEMA. The NFIP involves the promulgation of regulations (i.e., the minimum eligibility criteria), providing insurance, and actions that indirectly cause modifications of the land and water (e.g., FEMA's mapping of floodplains determines the applicability of local land use regulations, and FEMA's CRS provides incentives to modify the floodplains in certain ways). Accordingly, the NFIP falls within the broad definition of "agency action" to which Section 7(a)(2) applies. *See TVA v. Hill*, 437 U.S. at 173, 98 S.Ct. 2279 (Section 7(a)(2)'s language "admits of no exception"); *Natural Res. Def. Council ("NRDC") v. Houston*, 146 F.3d 1118, 1125 (9th Cir.1998) ("The term 'agency action' has been defined broadly"); *Pacific Rivers Council*, 30 F.3d at 1055 ("Following the Supreme Court's lead in *TVA*, [the Ninth Circuit] ha[s] also construed 'agency action' broadly.").

However, agency actions are subject to Section 7(a)(2)'s consultation requirements only if "there is discretionary Federal involvement or control." 50 C.F.R. § 402.03; *see also* 50 C.F.R. § 402.16 (requiring re-initiation of consultation where "discretionary Federal involvement or control over the action has been retained or is authorized by law"). "[W]here ... the federal agency lacks the discretion to influence the private action, consultation would be a meaningless exercise; the agency simply does not possess the ability to implement measures that inure to the benefit of the protected species." *Sierra Club v. Babbitt*, 65 F.3d 1502, 1509 (9th Cir.1995). In other words, "[w]here there is no agency discretion to act, the ESA does not apply." *NRDC v. Houston*, 146 F.3d at 1125–26.

The "discretion" issue is a critical one in the present case, warranting a review of Ninth Circuit precedent prior to analyzing the issue under the facts of the present case. In the Ninth Circuit cases of *Turtle Island Restoration Network, Pacific Rivers Council*, and *NRDC v. Houston*, the court held that the agency at issue had discretion to act for the benefit of the protected species. In *Turtle Island Restoration Network*, NMFS's issuance of fishing permits pursuant to a federal law governing high seas fishing constituted a discretionary agency action where the plain language of the federal law governing the permitting process required NMFS to issue permits in a manner that would increase "the effectiveness of international conservation and management measures." 340 F.3d at 975–77. In *Pacific Rivers Council*, the Forest Service's land resource management plans ("LRMPs") constituted continuing agency action requiring consultation. 30 F.3d at 1054. Even though the LRMPs were adopted before the species at-issue was listed as threatened, the LRMPs were considered "important programmatic docu-

ments [18] that set out guidelines for resource management in the forests" and, as such, they had "ongoing effects extending beyond their mere approval" and "can be actions even after their implementation." *Id.* at 1055. In *NRDC v. Houston,* negotiating the renewal of water contracts constituted a discretionary agency action where federal laws mandated that the Bureau of Reclamation renew the contracts on "mutually agreeable" terms and where federal laws left open to the Bureau's discretion the amount of water available for sale through the renewed contracts. 146 F.3d at 1126.

On the other hand, the Ninth Circuit cases of *Simpson Timber* and *Sierra Club v. Babbitt* did not involve discretionary agency action. Both cases involved governmental contracts with private entities. The agency action (i.e., entering into a contract) in those cases had been completed at the time plaintiffs sought to require consultation and the key question was whether the agency had retained the power to implement measures that inure to the benefit of the protected species. *Simpson Timber,* 255 F.3d at 1080; *Sierra Club,* 65 F.3d at 1509.

*Simpson Timber* involved an incidental take permit allowing the Simpson Timber Company to take a limited number of spotted owl over a thirty-year period in the course of its logging activities. *Id.* at 1076–77. FWS retained some authority over the course of the thirty year permit: ten years after issuance FWS would review the permit for compliance, FWS could suspend the permit in the event of a significant violation or breach, and FWS had the authority to revoke the permit if the activities it authorized resulted in the taking of threatened species other than the spotted owl. *Id.* at 1078. The plaintiff argued that FWS had the authority to take action that inured to the benefit of species other than the spotted owl that were listed as threatened after the issuance of the permit. *Id.* at 1079. The court disagreed and held that FWS did not "retain discretionary control [under the permit] to make new requirements to protect" the marbled murrelet or the coho salmon, species that were listed as endangered or threatened after the northern spotted owl permit had been issued. *Id.* at 1081. While it could revoke the permit if the Simpson Timber Company was found to be taking other listed species, it could not impose new requirements on the company. *Id.* at 1082–83. Thus, the FWS had no obligation to re-initiate consultation under Section 7(a)(2) to consider the permit's effects on those species. *Id.* at 1083. *Sierra Club v. Babbitt* involved a right-of-way agreement between the Bureau of Land Management and a private logging company that pre-dated the ESA. 65 F.3d at 1505, 1508. The Bureau of Land Management retained discretion to influence the private conduct in three limited areas, none of which were related to the conservation of the threatened spotted owl. *Id.* at 1509.

In the present case, FEMA and the Intervenors argue that formal consultation under Section 7(a)(2) of the ESA is not required because implementing the NFIP is not a discretionary action for the purposes of the ESA.[19] They submit that Con-

---

**18.** The Ninth Circuit in *Pacific Rivers Council* expressly rejected the argument that "only the specific activities authorized by the LRMPs are agency actions within the meaning of the ESA." *Id.* Thus, the Court may consider the NFIP as a whole, as urged by the Plaintiffs, rather than its individual components, when analyzing the "agency action" issue. However-

er, as noted below, the Court finds it useful to individually assess the component parts of the NFIP in determining the appropriate scope of possible relief in the present case.

**19.** However, in an e-mail to an employee at the NOAA Fisheries Northwest Region, an attorney at FEMA indicated that in Novem-

gress has not provided FEMA with discretion under the NFIA (and its subsequent amendments) to implement measures under the NFIP that inure to the benefit of the Puget Sound chinook salmon. In support of this argument, FEMA and the Intervenors rely upon *Simpson Timber*, *Sierra Club v. Babbitt*, and *Turtle Island Restoration Network*.

Neither *Simpson Timber* nor *Sierra Club v. Babbitt* control in the present case because the "agency action" in both of these cases involved a contract between a federal agency and a private entity. In each case, the contract had been completed at the time the plaintiffs sought to require consultation, and there was no contract term that authorized the agency to intervene for the benefit of protected species. The terms of the contract in those cases determined the existence and nature of the agency's discretion. Therefore, the agency action in both cases was completed and there was no ongoing agency action. In the present case, there is no contract; thus, the Court looks to the enabling statute to determine whether the agency has discretion, as was the case in *Turtle Island Restoration Network* and *NRDC v. Houston*. Moreover, the NFIP influences the management of an entire ecosystem (i.e., floodplains) on an ongoing basis, just as the LRMPs in *Pacific Rivers Council* guided resource management on forest lands. The Court concludes that the present case involves a continuing agency action akin to the LRMPs in *Pacific Rivers Council* because, like the LRMPs,

FEMA's passage of the minimum eligibility criteria, the mapping of floodplains, and the implementation of the CRS have ongoing effects extending beyond their mere approval.[20] Like the LRMPs, FEMA's actions in implementing, monitoring, and enforcing the NFIP can be actions subject to ESA consultation even though some of the regulations and programs were adopted before the listing of the Puget Sound chinook salmon in 1999.

*Turtle Island Restoration Network* requires further discussion. This case held that the agency had discretion to act for the benefit of protected sea turtles based on the enabling statute's enumerated purpose to increase the effectiveness of "international conservation and management measures," expressly defined by the statute as "measures to conserve or manage one or more species of living marine resources." 340 F.3d at 976. The Ninth Circuit noted that "one such measure is the Inter–American Convention for the Protection and Conservation of Sea Turtles, which was designed to promote the protection . . . of sea turtle populations." *Id.* The Ninth Circuit reversed the district court's "no discretion" holding. The Ninth Circuit clarified its holding by noting that "[w]hether the Fisheries Service *must* condition permits to benefit listed species is not the question before this court, rather, the question before us is whether the statutory language of the [enabling statute] confers sufficient discretion to the Fisheries Service so that the agency *could* condi-

ber, 2003 it was "unclear whether FEMA is required to consult with regard to the NFIP." AR 48–49.

20. The Intervenors argue that the Plaintiffs are asking the court to order FEMA to engage in rulemaking under the guise of requesting ESA consultation. Both the CRS and the minimum eligibility criteria are codified in existing regulations. The Intervenors argue

that ESA consultation is an inappropriate means to amend regulations. However, the definition of agency action for the purposes of the ESA includes "the promulgation of regulations" as one example of a potential agency action requiring consultation. 50 C.F.R. § 402.02. Thus, it appears that agency regulations are legitimate potential objects of ESA consultation.

tion permits to benefit listed species." *Id.* at 977 (emphasis in original).

This is a subtle but important distinction that is also demonstrated by the holding in *NRDC v. Houston,* a case in which the Federal Reclamation Laws gave the Bureau of Reclamation the ability to renew 40 year water service contracts on "mutually agreeable terms," determined that water rights were based on the amount of available project water and gave the Secretary of the Interior the discretion to set water rates to cover "an appropriate share" of the cost of maintenance and operation. 146 F.3d at 1126. The Ninth Circuit held that this enabling statute gave the Bureau of Reclamation discretion to reduce the total amount of water available to water rights holders, which, in turn, could allow more water to be available for listed salmon. *See id.* The Ninth Circuit in *NRDC v. Houston* did not require the statute to have as one of its stated purposes the protection of the environment, wildlife or endangered species. The key was whether the agency had discretion to act in a manner that could benefit the listed species, which it did because it could adjust the amount of water available to water rights holders to accommodate increased flows for salmon. The court also noted that the Bureau of Reclamation had discretion to act for the benefit of the listed species based on the federal law mandating the Bureau to renew the water contracts on "mutually agreeable" terms. *Id.*

In sum, although *Turtle Island Restoration Network* found the environmental language in the enabling statute to be the source of the discretion for the federal agency in that case, an environmental purpose need not be expressed in the enabling statute to trigger Section 7(a)(2) of the ESA. *NRDC v. Houston* demonstrates that a stated environmental purpose is not necessary if the action agency otherwise has discretion to act in such a way that

could benefit the endangered and threatened species. Indeed, most federal agency actions would not be subject to the formal consultation process under Section 7(a)(2) if the ESA only applied to agency actions where the agency was already compelled by statute to protect listed species. Furthermore, a narrow interpretation of the term "agency action" that only applies Section 7(a)(2) to actions carried out under environmental statutes would conflict with the broad reading of the term given by the United States Supreme Court and the Ninth Circuit.

■ Applying *Turtle Island Restoration Network* and *NRDC v. Houston* to the present case, the issue is whether the NFIA confers sufficient discretion on FEMA so that FEMA *could* implement the NFIP to benefit the Puget Sound chinook salmon, not whether FEMA *must* implement the NFIP to benefit the salmon. The fact that the NFIP is an insurance, not an environmental, program does not foreclose the agency's discretion to implement measures to benefit the salmon. One of the seven enumerated purposes of the NFIP authorizes FEMA to guide development away from locations threatened by flood hazards, *see* 42 U.S.C. § 4001(e)(2), which, in turn, would help preserve the natural floodplain functions that benefit salmon. This provision grants FEMA the discretion to act for the benefit of the salmon in the same way that the Bureau of Reclamation had discretion to adjust the water supply available to water rights holders to benefit salmon in *NRDC v. Houston.* Additionally, the NFIA states that FEMA "shall consult with other departments and agencies of the Federal Government ... in order to assure that the programs of such agencies and the flood insurance program authorized under this chapter are mutually consistent." 42 U.S.C. § 4024. This "shall consult" lan-

guage not only gives FEMA discretion to consult, but appears to *require* FEMA to consult with other agencies, such as NMFS, to ensure that the NFIP is implemented in a manner that is "mutually consistent" with NMFS's programs. Accordingly, the Court holds that FEMA has discretion to act for the benefit of the Puget Sound chinook salmon in implementing the NFIP and thus consultation with the NMFS is ordered. However, because "the implementation of the NFIP" is a vague way to describe the agency action at issue, the Court examines the component parts of the NFIP to determine whether FEMA has discretion with respect to each part. The Court feels compelled to take this component-by-component approach because the scope of any injunctive relief ordered by the Court hinges on the ability of FEMA to act for the benefit of the Puget Sound chinook salmon with respect to each component part of the NFIP.

### Mapping.

FEMA argues that its mapping of a floodplain is "exceedingly ministerial," based solely on a technical evaluation of the base flood elevation. However, FEMA has used its discretion to map the floodplain in a way that allows persons to artificially fill the floodplain to actually remove it from its floodplain status, and thus from regulatory burdens. There is nothing in the NFIA authorizing, let alone requiring, FEMA to authorize filling activities to change the contours of the natural floodplain. Indeed, such regulations may be counterproductive to the enabling statute's purpose of discouraging development in areas threatened by flood hazards. As a result of FEMA's discretion in its mapping activities, FEMA must consult on its mapping regulations and its revisions of flood maps, to determine whether they jeopardize the continued existence of the Puget Sound chinook salmon. Because the

NFIA requires FEMA to review flood maps at least once every five years to assess the need to update all floodplain areas and flood risk zones, 42 U.S.C. § 4101(e), (f)(1), the agency activity is clearly an ongoing one that is subject to the ESA's consultation requirements.

### Eligibility Criteria.

In developing the minimum eligibility criteria, the NFIA authorizes FEMA to guide development of proposed construction away from locations threatened by flood hazards and to "otherwise improve the long-range land management and use of flood-prone areas." 42 U.S.C. § 4102(c)(2), (c)(4). Pursuant to either of these purposes, FEMA has the discretion to revise the minimum eligibility criteria to benefit the Puget Sound chinook salmon.

Even if it is true that FEMA has discretion to revise the minimum eligibility criteria, FEMA and the Intervenors argue that FEMA's authority to engage in rulemaking is not an "ongoing agency action" to be subject to the ESA's consultation requirements. FEMA's Cross–Mot. at 11 n. 5; Intervenors' Cross–Mot. at 34–36. The Intervenors argue that unless the NFIA imposes a clear, non-discretionary obligation on FEMA to amend its regulations, Plaintiffs' cause of action is not ripe for review. *Id.* at 35. They argue that NWF is using the ESA's consultation provision to create, rather than respond to, an agency action. *Id.* at 36. Plaintiffs respond that the minimum eligibility criteria are analogous to the LRMPs in *Pacific Rivers Council,* which the Ninth Circuit held represented "ongoing agency action" because they were "comprehensive management plans" with "an ongoing and long-lasting effect even after adoption." Pls.' Reply, docket no. 40, at 11. Plaintiffs also highlight a District of Idaho case in which the Court held that the Bureau of Land Management's decision not to take action con-

stituted agency action. Second Hasselman Decl., docket no. 40(1), Ex. 15 (*Western Watersheds Project v. Matejko*, No. 01–0259–E–BLW (D.Idaho Mar. 23, 2004)). In *Western Watersheds*, the Bureau of Land Management's regulations, which did not impose conditions on water diversions arising under an 1866 statute, constituted a continuing agency action under the rationale of *Pacific Rivers Council*. *Id.* at 9, 11. In the present case, FEMA must consult on its minimum eligibility criteria because FEMA has discretion to amend its regulations and because those regulations have an ongoing impact on the use of floodplains in the same manner as the LRMPs have an ongoing impact on the use of forest lands in *Pacific Rivers Council*.

### Sale of Insurance.

■ FEMA has no discretion to deny flood insurance to a person in a NFIP-eligible community. *See* 42 U.S.C. § 4012(c) (requiring FEMA to provide flood insurance to communities which have "evidenced a positive interest in securing flood insurance coverage under the flood insurance program" and have "given satisfactory assurance that … adequate land use and control measures will have been adopted … which are consistent with the comprehensive criteria for land management and use developed" under 42 U.S.C. § 4102). As a result, FEMA has no obligation to consult with NMFS regarding the actual sale of flood insurance.

### Community Rating System.

FEMA has discretion to promote conservation measures through the CRS. The CRS is a voluntary program through which Congress mandated that FEMA provide discounts on flood insurance premiums to communities that implement flood management regulations that exceed FEMA's minimum criteria. As noted above, some of the CRS criteria help salmon, and some are detrimental to salmon.

Even though the program is voluntary, it is "authorized" and "carried out" by a federal agency in a way that may adversely affect the Puget Sound chinook salmon. Further, by offering discounts to communities that adopt certain types of regulations, FEMA could encourage the adoption of salmon-friendly measures in local communities. For these reasons, formal consultation is required.

In conclusion, the NFIA confers discretion on FEMA to implement the NFIP in a manner that would inure to the benefit of the Puget Sound chinook salmon, with the exception of the part of the program that deals with the actual sale of flood insurance. Although FEMA has no discretion when it comes to the provision of flood insurance to persons in NFIP-eligible communities, it has discretion to act in a manner that could benefit the Puget Sound chinook salmon in mapping the floodplains, in developing and promulgating the minimum eligibility criteria, and in implementing the CRS. Accordingly, the Court holds that FEMA's implementation of the NFIP, with the exception of the actual sale of flood insurance, is a discretionary "agency action" for the purposes of Section 7(a)(2) of the ESA.

### b. Agency Action that "May Affect" a Listed Species

The second issue in determining whether the ESA's formal consultation requirement is triggered is whether FEMA's implementation of the NFIP "may affect" the Puget Sound chinook salmon. *See* 50 C.F.R. § 402.14(a). "Any possible effect, whether beneficial, benign, adverse, or of an undetermined character, triggers the formal consultation requirement." 51 Fed. Reg. 19,926, 19,949 (June 3, 1986) (final rule 50 C.F.R. pt. 402). The "threshold for formal consultation must be set sufficiently low to allow Federal agencies to

satisfy their duty to 'insure' under Section 7(a)(2)." 51 Fed.Reg. at 19,949.

FEMA contends that the ESA's formal consultation requirement is not triggered because "FEMA has not had reason to believe that the NFIP may affect the Puget Sound chinook salmon," FEMA's Cross–Mot., docket no. 36, at 22. Although FEMA has not documented its "no effect" determination, FEMA relies on *Southwest Ctr. for Biological Diversity v. United States Forest Serv.*, 100 F.3d 1443 (9th Cir.1996), for the proposition that "[n]o consultation is necessary where an agency undertakes an action that will have 'no effect' on an endangered or threatened species." FEMA's Cross–Mot. at 22. *Southwest Center* is distinguishable on two fronts: first, it is not an ESA case and, second, the action agency in that case prepared a biological assessment, which FEMA has not done in the present case. 100 F.3d at 1445. FEMA also relies on *Pacific Rivers Council* to support its related argument that "if the agency determines that a particular action will have no effect on an endangered or threatened species, the consultation requirements are not triggered." 30 F.3d at 1054 n. 8. This is dicta, and FEMA has pointed to no case where an action agency avoided its formal consultation duty based on the agency's "no effect" determination. The lack of any documentation to support FEMA's "no effect" determination precludes any judicial review of FEMA's apparent "determina-tion" and undermines the other Section 7(a)(2) consultation procedures that only allow an agency to avoid formal consultation through a biological assessment or a concurrence letter following informal consultation with FWS or NMFS. *See* 50 C.F.R. § 402.14(b)(1).

■ Plaintiffs argue that the "may affect" standard is met because the NFIP affects development in the floodplains and such development "may affect" the Puget Sound chinook salmon and its habitat. A summary of the record and non-record evidence in support of Plaintiffs' position is outlined at pages 18–19 of Plaintiffs' reply brief, docket no. 40.[21] Among other evidence, Plaintiffs point to a 1998 letter from NMFS to FEMA (Region X, Bothell, Washington) in which NMFS itself opined that the NFIP may lead to increased development that negatively affects salmon:

> NMFS ... believes it is appropriate for FEMA to consult with NMFS regarding [FEMA's disaster assistance] programs, as required by Section 7 of the Endangered Species Act. In particular, we are aware that *the National Flood Insurance Program (NFIP), as currently implemented by FEMA, could result in increased development in flood-prone areas with consequent impairment of floodplain functions of salmon bearing waters.*

AR 109 at 1 (emphasis added).[22] Although NMFS "lacks the authority to require the

---

**21.** The Plaintiffs note how development in the floodplain can negatively affect Puget Sound chinook salmon. The Plaintiffs cite a 1984 Department of the Interior Solicitor's opinion that "but for" the activities of FEMA development in flood plains probably would not take place. Memo of the Associate Solicitor, U.S. Dept. of the Interior (Aug. 21, 1984), at 6–7, *cited in Florida Key Deer*, 864 F.Supp. at 1232.

**22.** In a letter dated October 6, 2000, the Washington State Department of Ecology ("DOE") urged FEMA to initiate ESA consultation on its implementation of NFIP, noting that in some places the entire 100–year floodplain where FEMA makes flood insurance available, may be critical salmon habitat. Specifically, the DOE expressed concern about the one-foot rise floodplain, the Letter of Map Revision process, and "the link between flood-related riverine erosion and the ongoing discussions regarding the need to identify and regulate channel migration zones along salmon-bearing streams." AR 8.

initiation of consultation," 51 Fed.Reg. at 19,949, the Court gives substantial deference to NMFS's construction of its own consultation regulations in determining whether FEMA has failed to fulfill its responsibilities under the ESA. *See Sierra Club v. Marsh,* 816 F.2d 1376, 1388 (9th Cir.1987) (deferring to FWS as to whether re-initiation of consultation was warranted under its regulations at 50 C.F.R. § 402.16). NMFS's opinion that the NFIP may increase development and may therefore affect salmon is not an isolated one in the administrative record. Even FEMA recently suggested informal consultation with NMFS regarding the impact of NFIP implementation on chinook salmon. AR 47–53.

FEMA asserts that Plaintiffs have mischaracterized the issue, and that "[t]he proper analysis is not whether development affects salmon, but rather, whether the federal agency action at issue (i.e., the NFIP) 'may affect' the salmon." FEMA's Cross–Mot., docket no. 36, at 22. FEMA takes too narrow an approach. The regulations implementing Section 7(a)(2) of the ESA require an action agency to consider "the effects of the action as a whole." 50 C.F.R. § 402.14(c). " 'Effects of the action' refers to the direct and indirect effects of an action on the species or critical habitat." 50 C.F.R. § 402.02. "Indirect effects are those that are caused by the proposed action and are later in time, but still are reasonably certain to occur." *Id.* In *Nat'l Wildlife Fed'n ("NWF") v. Coleman,* 529 F.2d 359, 373–74 (5th Cir.1976), record and non-record evidence showed that the construction of a highway would lead to increased residential and commercial development, which, in turn, would affect the habitat of the endangered Mississippi sandhill crane. The "the total impact of the highway on the crane," not merely the direct loss of habitat taken by the highway right-of-way, had to be considered. *Id.* at 373. The *NWF v. Coleman* court thus required the transportation agency to consult with FWS to determine whether the private development accompanying the construction of the highway would jeopardize the existence of the crane.

FEMA attempts to distinguish *NWF v. Coleman,* noting that the highway was 90 percent federally funded and that the transportation agency controlled the placement of the highway and interchanges. FEMA's Cross–Mot., docket no. 36, at 23. However, just as the transportation agency in *NWF v. Coleman* controlled the placement of the highway and interchanges, FEMA designates the boundaries of the floodplains on flood maps. Both of these actions affect the location of development. Whether or not FEMA funds the NFIP, in whole or in part, is immaterial because it is undisputed that FEMA is the federal agency charged with administering the NFIP and that is sufficient to qualify as an "agency action." In neither the present case nor *NWF v. Coleman* does the action agency authorize, permit, or carry out the actual development that causes the harm to the species' habitat; however, in both cases, development is "reasonably certain to occur" as a result of the agency's action. *See* 50 C.F.R. § 402.02.[23]

 The Court concludes that there is substantial evidence in the administrative record showing that FEMA's implementa-

---

23. FEMA suggests that unless the indirect effects of the NFIP on the listed species are "reasonably certain to occur," FEMA's Cross–Mot. at 23, no ESA consultation is required. The indirect effects must be "reasonably certain to occur" in that the third-parties at issue must be reasonably certain to take action given the government agency's action, but both the indirect and direct effects still trigger consultation if they "may affect" listed species. 50 C.F.R. 402.14(a); *see NWF v. Coleman,* 529 F.2d at 373–74.

tion of the NFIP "may affect" the Puget Sound chinook salmon, thus triggering the formal consultation requirement of Section 7(a)(2) of the ESA.

### 3. *Conclusion on the Merits of Plaintiffs' Section 7(a)(2) Claim*

FEMA's implementation of the NFIP as outlined herein, with the exception of the actual sale of flood insurance, is a discretionary "agency action" that "may affect" the Puget Sound chinook salmon, triggering the formal consultation requirement of Section 7(a)(2).

### D. *Retention of Jurisdiction*

The Court retains jurisdiction to ensure compliance with the injunctive relief ordered by the Court.

## III. *CONCLUSION*

The Court GRANTS IN PART and DENIES IN PART each of the three cross-motions for summary judgment before the Court: (1) Plaintiffs' Motion for Summary Judgment, docket no. 30; (2) Federal Defendant's Cross–Motion for Summary Judgment, docket no. 36; and (3) Intervenor Defendants' Cross–Motion for Summary Judgment, docket no. 37. The Court concludes that:

(1) Plaintiffs have standing to maintain this action.

(2) FEMA has violated Section 7(a)(2) of the ESA by failing to consult with NMFS to ensure that: (1) the regulations establishing the minimum eligibility criteria for the NFIP, (2) the mapping of the floodplains, and revisions thereof, and (3) the CRS are not likely to jeopardize the continued existence of the Puget Sound chinook salmon. FEMA's failure to consult with NMFS is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

(3) FEMA must initiate consultation with NMFS on the impacts of its implementation of the NFIP—specifically on the impacts of the minimum eligibility criteria, the mapping of the floodplains, and revisions thereof, and the CRS—on the Puget Sound chinook salmon, within 60 days of the entry of this Order. FEMA need not initiate consultation with NMFS on the impacts of the actual sale of flood insurance, either directly or through third parties, on the Puget Sound chinook salmon.

(4) The Court retains jurisdiction to ensure that FEMA complies with its obligation to consult with NMFS.

(5) Within 60 days of the entry of this Order, FEMA shall file a status report advising the Court and the parties to this litigation as to the schedule for completion of its formal consultation.

Plaintiffs are directed to file with the Court within 20 days of this Order a proposed judgment consistent with this Order. FEMA and Intervenor shall have 10 days to file written objections to the proposed judgment and to submit any revised judgment consistent with this Order.

IT IS SO ORDERED.