MARBLED MURRELET, (Brachyramphus marmoratus); Northern Spotted Owl, (Strix occidentalis caurina); Environmental Protection Information Center, Plaintiffs–Appellees,

v.

Bruce BABBITT, Secretary, U.S. Department of Interior; Mollie Beattie, Director, United States Fish and Wildlife Service; Michael Spear, Director, Region 1, United States Fish & Wildlife Service; United States Fish & Wildlife Service, Defendants,

and

Pacific Lumber Company, a Delaware Corporation; Scotia Pacific Holding Company, a Delaware Corporation; Salmon Creek Corporation, a Delaware Corporation, Defendants–Appellants.

No. 95–16945.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 14, 1996.

Decided May 7, 1996.

---

Jared G. Carter, Behnke & Oglesby, Ukiah, California and David S. Winton, Pillsbury Madison & Sutro, San Francisco, California, for defendants-appellants.

Thomas N. Lippe, San Francisco, California, for plaintiffs-appellees.

James C. Kilbourne and Edward J. Shawaker, Appellate Section, United States Department of Justice, Washington D.C., for defendants-amici.

Before: THOMPSON and TASHIMA, Circuit Judges, and WILSON,* District Judge.

DAVID R. THOMPSON, Circuit Judge:

The appellants are private corporations engaged in the lumber business. We refer to them collectively as "the Lumber Companies." They wanted to cut and remove dead, dying and decayed trees in California. The United States Fish & Wildlife Service (USFWS) consulted with them and provided them with information as to what they would have to do to avoid a "take" of endangered species under the Endangered Species Act (ESA).

In an effort to stop the intended tree cutting and removal, the plaintiffs filed an action for declaratory relief. They contended that the USFWS had gone beyond providing advice to the Lumber Companies, had assumed authority and control over the intended salvage operation, and as a result had engaged in federal "agency action." Federal agencies engaging in "agency action" are required by section 7 of the ESA, 16 U.S.C. § 1536, to undertake certain procedures, including preparation of a biological assessment and a biological opinion. The USFWS did not do this.

The plaintiffs applied for a preliminary injunction, and the district court granted it. The court determined that the balance of hardships tipped sharply in favor of the plaintiffs and that serious questions existed as to whether the USFWS had engaged in "agency action" which triggered the requirements of section 7 of the ESA. The district court also determined that serious questions existed as to whether the USFWS had engaged in a "major federal action" under the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321, et seq. This Act also requires procedures the USFWS did not undertake, including the preparation of an Environmental Assessment or an Environmental Impact Statement.

The Lumber Companies have appealed the district court's grant of the preliminary injunction.[1] We have jurisdiction under 28 U.S.C. § 1292(a)(1), and we reverse. We hold that because the USFWS did nothing more than provide consultation and information under its power to enforce section 9 of the ESA, 16 U.S.C. § 1538, et seq., there is

---

* Honorable Stephen V. Wilson, District Judge for the Central District of California, sitting by designation.

1. The federal defendants have not appealed because injunctive relief was not entered against them. They have, however, filed an amici curiae brief, arguing that the advice they gave the Lumber Companies did not amount to "agency action" or a "major federal action" which triggered federal obligations under the ESA or NEPA.

no evidence of federal discretionary involvement or control over the Lumber Companies' proposed tree harvest. As a result, there is no serious question whether the federal defendants engaged in "agency action" under section 7 of the ESA or in a "major federal action" under NEPA. Without the predicate of a "serious question," there is no legal basis for the preliminary injunction issued by the district court.

## I

## BACKGROUND

### A. Parties

The plaintiffs are the Environmental Protection Information Center, the Marbled Murrelet, and the Northern Spotted Owl (collectively EPIC). They filed suit for declaratory and injunctive relief against the federal defendants, Bruce Babbitt, Secretary of the United States Department of Interior, Mollie Beattie, Director of the United States Fish & Wildlife Service, Michael Spear, Director, Region 1, United States Fish & Wildlife Service, and against the USFWS; they also sued the Lumber Companies.

Although there are no state parties in this litigation, the California Department of Forestry and Fire Protection (CDF) was involved in the intended tree salvage pursuant to California's Z'berg–Nejedly Forest Practice Act (FPA). This Act generally requires that before commencing any timber operations in California, a Timber Harvest Plan (THP) must be submitted and approved by the CDF. Cal. Pub. Res.Code §§ 4581–4582.75. Exemptions from these state requirements may be obtained. *Id.* § 4584. One of these exemptions is for the cutting and removal of "dead, dying and diseased trees" which amount to less than ten percent of the average volume per acre, subject to certain conditions. *Id.* § 4584(c); Cal.Code Regs. tit. 14, § 1038(b). This exemption, however, does not permit tree cutting or removal in key habitat areas of rare, endangered, or threatened species, or within the buffer zone of such areas. Cal.Code Regs. tit. 14, § 1038(b)(3), (7), & (8).

To obtain a permit to harvest dead, dying and diseased trees, a notice of such proposed timber operation must be submitted to the CDF. Cal.Code Regs. tit. 14, § 1038.1. Within ten days of receipt of the notice, the CDF must determine whether the notice is "complete and accurate." Cal.Code Regs. tit. 14, § 1038(e). If it is complete and accurate, the CDF sends a notice of acceptance to the submitter. *Id.* If not, the CDF returns the notice to the submitter. *Id.* If the CDF fails to act within ten days of receipt of the notice, the timber operations may commence. *Id.*

### B. Facts

In the fall of 1994, the Lumber Companies submitted and the CDF accepted two notices of proposed timber operations to salvage dead, dying and diseased trees on two parcels of the Lumber Companies' land. One parcel covered 179,103 acres, the other 12,695 acres. Both parcels are in Humboldt County in Northern California. A few months later, the Lumber Companies submitted, but the CDF did not accept, a similar notice of proposed timber salvage for another 5,994 acre parcel in Humboldt County including Headwaters Forest. Headwaters Forest is a previously unentered, 3,000-acre old-growth redwood stand. In a letter accompanying this notice, the Lumber Companies noted that some of the area might be important to threatened or endangered wildlife.

The CDF returned the notice on March 6, 1995, asking the Lumber Companies to provide the location and habitat of any rare, endangered, or threatened species. Two days later, the Lumber Companies resubmitted the notice, with five additional pages of information designating particular areas as possibly important to protected species.

On March 15, 1995, the CDF accepted the Lumber Companies' resubmitted notice. The CDF's acceptance reiterated and clarified the conditions that the Lumber Companies consult with and inform the California Department of Fish and Game (CDFG) and the USFWS before commencing timber operations. Two days later, the CDF again wrote to the Lumber Companies requiring an on-site inspection "whereby the agencies must approve the cutting of any standing trees." On March 24, 1995, the Lumber

Companies wrote to the CDF disputing several conditions imposed by the CDF.

Four days later, a resources manager of one of the Lumber Companies met with representatives of the USFWS and the state CDFG. Following this meeting, the USFWS and the CDFG sent a joint letter to the Lumber Companies dated April 12, 1995. This letter reviewed the meeting and the on-site inspections and laid down several specific conditions that had to be met to comply with Cal.Code Regs. tit. 14, § 1038(b)(7) and with other state rules, and to avoid a 'take' of identified species under the federal ESA.

On May 3, the Lumber Companies responded to the April 12 letter seeking clarification of conditions. Finding the conditions too restrictive, the Lumber Companies stated they were considering filing an action against the United States and California for inverse condemnation.

The USFWS and the state CDF provided the requested clarification by letter dated July 18, 1995. On September 1, 1995, the Lumber Companies notified the CDF, CDFG, and USFWS that they would fully comply with all conditions laid out in the past communications. They stated they intended to commence cutting and removing dead, dying and diseased trees in the Headwaters Forest sometime shortly after September 15, 1995. On September 15, 1995, EPIC filed its complaint.

## C. Procedural History

■ In the complaint, EPIC alleged that the USFWS had exercised discretionary federal control over the Lumber Companies' timber operations, thereby triggering the USFWS's duty under section 7 of the ESA to prepare a biological assessment and a biological opinion. EPIC also alleged that the

USFWS had engaged in "major federal action" within the meaning of NEPA, requiring the preparation of an environmental impact statement. EPIC sought to enjoin the Lumber Companies from salvaging the trees and to enjoin the Secretary of the Interior and the USFWS from approving any cutting or removal pursuant to the exemption notices without first preparing a biological assessment and opinion, and an Environmental Impact Statement (EIS). On September 29, 1995, the district court entered a preliminary injunction against the Lumber Companies, but not against the federal defendants. This appeal followed.[2]

### II

### DISCUSSION

The core issue is whether evidence was presented to the district court which indicated discretionary federal involvement or control over the Lumber Companies' intended tree salvage operations sufficient to raise a serious question whether the USFWS engaged in "agency action" under the ESA or a "major federal action" under NEPA.

■ Before we reach this issue, however, we must address the Lumber Companies' jurisdictional argument that EPIC's intent-to-sue letter was inadequate under 16 U.S.C. § 1540(g)(2)(A)(i).[3] This statute requires that before a citizen may commence an action under the ESA, the citizen must give the alleged violators and the Secretary of the Interior at least 60 days advance notice of intent to sue. This requirement is jurisdictional. *Save the Yaak Comm. v. Block*, 840 F.2d 714, 721 (9th Cir.1988). The purpose of this notice is to give the federal government and any alleged violators an opportunity to comply, and thus render a citizen suit unnec-

2. The federal defendants filed a motion during this appeal for permission to file an addendum to their amici curiae brief. The addendum is a copy of a declaration filed in the district court, but not included in the excerpt of record. The document is part of the record in this case. The motion is granted.

EPIC filed a motion requesting us to take judicial notice of a USFWS memorandum dated May 8, 1995, but not submitted to the district court. The document is not part of the record in this

case, and we deny the motion to take judicial notice of it.

3. Section 1540(g)(2)(A) provides:

No action may be commenced under [the citizen suit provision]—

(i) prior to sixty days after written notice of the violation has been given to the Secretary, and to any alleged violator of any such provision or regulation.

essary. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.,* 484 U.S. 49, 60, 108 S.Ct. 376, 383, 98 L.Ed.2d 306 (1987) (Clean Water Act); *Maine Audubon Soc'y v. Purslow,* 672 F.Supp. 528, 529–30 (D.Me. 1987) (ESA).

■ On March 21, 1995, EPIC sent the Lumber Companies and the federal defendants a letter captioned "Sixty Day Notice of Violations under Federal Endangered Species Act and Intent to File Suit Pursuant to 16 U.S.C. § 1540(g)." The Lumber Companies contend this letter failed to give adequate notice because it contemplated suit for a violation of section 9 of the ESA rather than a violation of section 7, the section of the ESA relied upon by EPIC in its complaint. We disagree.

The five-page letter describes the activity which EPIC believed violated section 9. Section 7 was referred to in only one part of the letter. This part stated:

> The ESA also prohibits federal actions which "will likely affect" a listed species unless full consultation with the Interior Secretary's delegate respecting such effects has occurred *and* the federal agency has "insure[d] that [its] action ... is not likely to jeopardize the continued existence of any [such] species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary ... to be critical...." 16 U.S.C. § 1536(a)(2).

(Emendations in original). Section 1536(a)(2), mentioned in the letter, is part of section 7 of the ESA.

In EPIC's notice letter, it refers to section 7 and section 9. The section 7 prohibition stated in the part of the letter quoted above does not limit the scope of the letter to a notice of suit only under section 7; nor does reference to the section 9 prohibition limit the scope of the letter to a notice of suit only under section 9. The letter clearly gives notice of an intent to sue under the ESA. Although section 7 was referenced in only one part of the letter, the letter as a whole provided notice sufficient to afford the opportunity to rectify the asserted ESA violations. This was sufficient to satisfy the jurisdictional requirement of notice under 16 U.S.C.

§ 1540(g)(2)(A)(i). The district court had subject matter jurisdiction, and we turn now to the merits of the appeal.

■ In this circuit, the test for granting a preliminary injunction is whether a party has demonstrated: (1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation, and the balance of hardships tips sharply in favor of the party seeking relief. *Sierra Club v. Marsh,* 816 F.2d 1376, 1382 (9th Cir.1987). The district court relied on the second part of this test in issuing its preliminary injunction.

Congress has determined that under the ESA the balance of hardships always tips sharply in favor of endangered or threatened species. *Id.* at 1383. EPIC, therefore, was entitled to a preliminary injunction if it demonstrated "sufficiently serious questions going to the merits to make them a fair ground for litigation." *Id.* at 1382.

■ "The merits" issue in this case is whether the USFWS engaged in "agency action" under section 7 of the ESA or a "major federal action" under NEPA. If there is a serious question of this, the district court did not err in granting the preliminary injunction; otherwise, it did.

"Agency action" is defined in section 7(a)(2) as "any action authorized, funded, or carried out by" a federal agency. 16 U.S.C. § 1536(a)(2). Section 7 applies to all actions in which there is "discretionary Federal involvement or control." 50 C.F.R. § 402.03.

■ Following the Supreme Court's lead in *TVA v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), we have construed "agency action" broadly. *Pacific Rivers Council v. Thomas,* 30 F.3d 1050, 1055 (9th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1793, 131 L.Ed.2d 721 (1995). An action is an "agency action" if there is "discretionary Federal involvement or control." *Sierra Club v. Babbitt, Seneca,* 65 F.3d 1502, 1509 (9th Cir.1995) (citing 50 C.F.R. §§ 402.03 & 402.16).

EPIC argues the USFWS exercised discretionary control over the Lumber Companies' proposed harvesting operations. Its theory is that the state's CDF originally had discretionary control over the Lumber Companies' intended salvage operations, and delegated this power to the USFWS. We do not consider this argument because we conclude that with or without such a delegation there was no discretionary federal involvement or control over the Lumber Companies' proposed salvage operations, and thus no "federal action" under section 7 of the ESA.

Referring to the letters dated March 15, March 17, and April 12, 1995, the district court determined that EPIC had presented evidence sufficient to raise a serious question as to whether the USFWS had exercised control over the Lumber Companies and thereby engaged in "agency action." The letters dated March 15 and March 17, however, were written by the state CDF, not the USFWS. The April 12 letter was a joint letter signed by both the CDFG and the USFWS. EPIC contends the following portion of this April 12 letter establishes the USFWS's discretionary involvement in, and control of, the proposed timber salvage operations:

> The following are specific conditions that must be followed to comply with § 1038(b)(7) and with other [California] Board of Forestry Rules under the exemption, and avoid "take" of the identified species under the ESA. In addition to these measures, all other conditions of § 1038(b) must be implemented.

One of the specific conditions of the April 12 letter required the Lumber Companies, in order to avoid a "take" of northern spotted owls, to provide a written description of the procedures to be followed. "These procedures must be followed by a 'no-take' determination by the USFWS." As to the marbled murrelet, the April 12 letter also provided, "site specific consultation with USFWS and DFG is required prior to timber harvest operations."

▮ Neither the CDF letters of March 15 and March 17, nor the joint CDFG–USFWS letter of April 12, provide evidence of federal involvement or control of the Lumber Com-

panies' proposed harvesting operations. Although the April 12 letter refers to the California Board of Forestry Rules and the ESA as authority for the conditions the letter sets forth, nothing in the letter justifies an inference that the federal agency, the USFWS, has the authority to enforce California's laws or regulations. Rather, state law and regulations are cited to legitimate the state agency's authority and federal law is cited to legitimate the USFWS's authority. The April 12 letter lays down conditions in mandatory language, but there is no evidence that the USFWS had any power to enforce those conditions other than its authority under section 9 of the ESA, and this is not enough to trigger "federal action" under section 7. *Babbitt, Seneca*, 65 F.3d at 1511 n. 15. When an agency "lacks the discretion to influence the private action" there is no "agency action." *Id.* at 1509.

Other communications between the USFWS and the Lumber Companies confirm that the USFWS was exercising authority drawn from its enforcement power under section 9 of the ESA. On July 18, 1995, another joint letter from the USFWS and the CDFG explained that the conditions set forth in the April 12 letter, were "intended to prevent a take of marbled murrelets." On March 3, 1995, in response to a press release, the USFWS wrote to the Lumber Companies expressing concern that their proposed harvest operations might result in a "take" of marbled murrelet and explicitly referring to its power to institute an "enforcement action" under the ESA. This power emanates from section 9.

It is clear from the record that the USFWS merely provided advice on how the Lumber Companies could avoid a "take" under section 9 of the ESA. Protection of endangered species would not be enhanced by a rule which would require a federal agency to perform the burdensome procedural tasks mandated by section 7 simply because it advised or consulted with a private party. Such a rule would be a disincentive for the agency to give such advice or consultation. Moreover, private parties who wanted advice on how to comply with the ESA would be loath to contact the USFWS for fear of trig-

gering burdensome bureaucratic procedures. As a result, desirable communication between private entities and federal agencies on how to comply with the ESA would be stifled, and protection of threatened and endangered species would suffer.

The record here establishes only that the USFWS provided advice under its power to enforce section 9 of the ESA. As a matter of law, such advisory activity does not constitute discretionary involvement or control over the Lumber Companies' proposed tree harvest operations. Thus, we conclude the district court erred in determining there was a serious question whether the USFWS engaged in "agency action" under section 7 of the ESA.

Nor is there a serious question whether the USFWS engaged in a "major federal action" under NEPA. NEPA requires federal agencies taking "major federal action significantly affecting the quality of the human environment" to assess the nature and extent of the action's environmental effects by preparing an Environmental Assessment and/or an Environmental Impact Statement. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1501.3, 1501.4, and 1502.4. "Major federal action" under NEPA includes activities "entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies." 40 C.F.R. § 1508.18(a).

The standards for "major federal action" under NEPA and "agency action" under the ESA are much the same. If there is any difference, case law indicates "major federal action" is the more exclusive standard. *Babbitt, Seneca*, 65 F.3d at 1512. Where, as here, there is no "agency action" under what is probably the more liberal standard of the ESA, there is no "major federal action" under the more exclusive standard of NEPA.

## III

## CONCLUSION

The district court's grant of the preliminary injunction is reversed. The case is remanded to the district court for further proceedings in accordance with this opinion.

REVERSED and REMANDED.