**CENTER FOR BIOLOGICAL DIVERSITY, et al., Plaintiffs,**

v.

**UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., Defendants.**

**No. CIV 05–261–TUC–CKJ.**

United States District Court, D. Arizona.

March 26, 2008.

Andrew Evans Hartsig, McCrystie J. Adams, Earthjustice Legal Defense Fund, Neil Levine, Neil Levine Law Offices, Denver, CO, for Plaintiffs.

Bridget Kennedy Mcneil, U.S. Dept of Justice, Denver, CO, Robert L. Miskell, U.S. Attorneys Office, Tucson, AZ, Lawson Emmett Fite Thomas Said–Tomash Zia U.S. Dept of Justice, Washington, DC, for Defendants.

## ORDER

JORGENSON, District Judge.

Pending before the Court are the parties' Motions for Summary Judgment [Docs. # 63, # 77]. Both parties have filed responses in opposition and replies to the respective motions. Oral argument was held on February 29, 2008. For the following reasons, Defendants' Motion for Summary Judgment is granted.

### I. Background[1]

The San Pedro River is one of the last free-flowing rivers in the desert Southwest. It is home to a myriad of plant and animal species and it supports a large riparian woodland area. Among those species are two that are listed as endangered on the Endangered Species list, the Hauchuca Water Umbel ("Umbel"), a plant, and the Southwest Willow Flycatcher ("Flycatcher"), a bird.[2]

The United States Congress recognized the importance of the San Pedro River and its dependent riparian habitat in 1988 by creating the San Pedro Riparian National Conservation Area (SPRNCA). 16 U.S.C. § 460xx states the SPRNCA was created "[i]n order to protect the riparian area and the aquatic, wildlife, archeological, paleontological, scientific, cultural, educational, and recreational resources of the public lands surrounding the San Pedro River in Cochise County, Arizona ..." The conservation area consists of 56,431 acres and is 36 miles long. In 1999, the United States

---

1. The facts stated herein are taken from both parties' Statements of Undisputed Facts.

2. The Umbel was listed as an endangered species in 1997 and the Flycatcher in 1995.

Fish and Wildlife Service ("FWS") designated 33.7 miles of the San Pedro as critical habitat for the endangered Umbel. In addition, the Flycatcher also relies on the San Pedro for habitat. However, groundwater pumping from the surrounding area is causing the water table to drop, thus draining the river. The San Pedro River has seen reduced flows and actually dried up completely for the first time in its recorded history at one area in 2005.

The FWS concluded in its 2002 Ft. Huachuca Biological Opinion that deficit groundwater pumping is the greatest threat to the Umbel habitat. Further, declining flows from the river threaten the Flycatcher. The FWS said that concerted effort must be made to manage water resources.

To combat this trend, the City of Sierra Vista formed the Water Management Team in order to take a proactive approach to water conservation. *See* Defendants' Exhibit A (Part 1) [Doc. # 100–3] Through water saving goals, projects, rebates, and other conservation efforts the city has reduced per-capita water use to levels last seen in the year 2000, even though the population has increased. *Id.* The San Pedro watershed also includes the cities of Bisbee, Huachuca City, and Tombstone, as well as unincorporated areas of Cochise County.

Plaintiffs argue that these efforts fall short of what is needed to preserve the SPRNCA. Plaintiffs allege that Defendants, U.S. Department of Housing and Urban Development ("HUD"), U.S. Department of Veterans Affairs ("VA"), and the Small Business Administration ("SBA") failed to comply with the Endangered Species Act ("ESA") and the National Environmental Policy Act ("NEPA"). Defendants provide mortgage insurance, loan guarantees, and loans ("financial assistance") for residential and commercial development in Sierra Vista, Arizona.

In particular, the mission of HUD is to realize " . . . the goal of a decent home and a suitable living environment for every American family . . ." 42 U.S.C. § 1441. HUD accomplishes this mission by providing mortgage insurance to low income families, allowing those families to purchase a home with favorable terms such as lower down payments and reduced interest rates. According to Plaintiffs' Statement of Undisputed Facts, HUD provided loan guarantees for 661 homes from 2000 to 2004, and 798 from 2000 through June 30, 2006. The total amount insured from 2000 through June 30, 2006 was $78,178,095. HUD also issued loan guarantees for an Alzheimer's facility and two apartment complexes in Sierra Vista.

The VA's mission is to provide housing assistance to veterans and their families. 38 U.S.C. §§ 3701–3764. The VA provides assistance by providing home loan guarantees. Many of these guarantees are automatic, as long as the veteran applying meets certain minimum criteria. According to Plaintiffs' Statement of Undisputed Facts, the VA guaranteed 2,062 home loans in Cochise County from fiscal year 2000 through fiscal year 2004. In total, the VA provided loan insurance for 4,073 loans between October 1999 and May 2005. The total amount guaranteed was $149,516,809 for that time period.

The SBA's mission is to provide loan assistance to small businesses. Like the VA, the SBA provides loan guarantees. The loans obtained may be used for a variety of purposes, such as equipment purchase, furniture and fixtures, as well as building renovation or construction. The SBA also provides revolving lines of credit for small businesses. According to Plaintiffs' Statement of Undisputed Facts, between August 2000 and February 2005 the

SBA provided financial assistance to 34 different businesses.

All of the above programs share one thing in common, there is no initial investment made by the federal agencies. The agencies merely provide a guaranty should the borrower default on the loan. Further, none of the loan guarantees relate to the construction of buildings in the critical habitat of the Umbel or the Flycatcher. However, Plaintiffs argue that the actions by these agencies nonetheless detrimentally affects the San Pedro River.

In Plaintiffs' Motion for Summary Judgment they allege that Defendants failed to comply with the ESA each time they provided financial assistance because they failed to consult with the FWS in order to assess the impact on the Umbel and the Flycatcher. In addition, it is alleged that the Defendants failed to comply with NEPA; in a similar fashion, because they did not review the environmental impacts of their financial assistance on the environment and on these species. The residential and commercial development in Sierra Vista facilitated by the Defendants pumps groundwater from an aquifer that supplies water to the San Pedro River.

Defendants do not contest that groundwater pumping threatens the natural resources of the San Pedro. Rather, they allege that the methods their financial assistance takes, to individuals and small business owners in Sierra Vista, do not rise to a level requiring compliance with the ESA or NEPA. Nor do the Defendants contest the Plaintiffs' standing to bring these claims. The Court finds that the Plaintiffs have standing to bring their claims, *see Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (Plaintiffs have established that (1) they have personally suffered an injury in fact; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, not merely speculative,

that the injury will be redressed by a favorable decision); *also Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) (association has standing as long as members of the association satisfy standing).

## II. Standard of Review

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), "there is no genuine issue as to any material fact and [ ] the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Thus, factual disputes that have no bearing on the outcome of a suit are irrelevant to the consideration of a motion for summary judgment. *Id.* In order to withstand a motion for summary judgment, the nonmoving party must show "specific facts showing that there is a genuine issue for trial," *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Moreover, a "mere scintilla of evidence" does not preclude the entry of summary judgment. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

In the case of NEPA, the Court reviews an agency's compliance under the Administrative Procedure Act ("APA"). 5 U.S.C. § 706(2)(A). An agency's decision is traditionally reviewed to determine if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" *Id.* However, if neither an Environmental Assessment ("EA") nor an

Environmental Impact Statement ("EIS") have been completed, and what is before the court are primarily legal issues, a court reviews the decision under "the less deferential standard of reasonableness" *Ka Makani 'O Kohala Ohana Inc. v. Water Supply,* 295 F.3d 955, 959 (9th Cir. 2002) (internal quotation marks and citations omitted).

The ESA does not specify a standard of review and thus courts apply the APA as well. *See Bennett v. Spear,* 520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997); 5 U.S.C. §§ 701–706. As the primary question before this Court is of a legal nature and no steps have been taken by the Defendants pursuant to the ESA, this Court will review their actions under the "reasonableness" standard.

### III. Analysis

### A. ESA

The ESA provides a means to conserve the ecosystems upon which endangered species and threatened species depend. 16 U.S.C. § 1531(b). A federal agency must ensure that any action it authorizes, funds, or carries out "is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of critical habitat of such species." 16 U.S.C. § 1536(a)(2). " 'Jeopardize the continued existence of' means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 502.02. " 'Destruction or adverse modification' means a direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species. Such alterations include, but are not limited to, alterations adversely modifying any of those physical or biological features that were the basis for determining the habitat to be critical." *Id.* When a federal agency proposes to take an action that may affect a threatened or endangered species or its critical habitat, that agency must consult with the FWS and obtain a biological opinion from the FWS as to whether the proposed action is likely to result in a violation of the ESA. *Id.*; 50 C.F.R. § 402. This is known as a "Section 7" consultation. However, if the action is not likely to "adversely affect" the species or habitat, *id.* § 402.14(b)(1), formal consultation is not required and informal consultation with the FWS will suffice, *id.*; §§ 402.14(a), 402.13(a).

### B. NEPA

NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). In enacting NEPA, Congress sought to assure that environmental, aesthetic, and cultural concerns are considered by federal decision-makers by requiring "the Federal Government to use all practicable means ... to improve and coordinate Federal plans, functions, programs, and resources ..." 42 U.S.C. § 4331(b). The cornerstone of NEPA is the EIS that an agency must prepare for all "major Federal actions significantly affecting the quality of the human environment ..." 42 U.S.C. § 4332(2)(C). In deciding whether to prepare an EIS, an agency may first prepare an EA. An EA provides sufficient evidence and analysis for determining whether to prepare an EIS or a finding of no significant impact (FONSI). Criteria for determining when a full EIS is required, include: "unique characteristics of the geographic area such as proximity to historic or cultural resources, parklands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas; whether the action is related to other actions with individually insignificant but cumulatively significant

impacts; and the degree to which the action may adversely affect an endangered ... species." 40 C.F.R. §§ 1508.27(b)(3), (7), (9).

Pursuant to NEPA, 42 U.S.C. § 4332(2)(C), a court must examine "the nature of the federal funds used and the extent of federal involvement." *Sierra Club v. Penfold,* 857 F.2d 1307, 1314 (9th Cir.1988).

### C. Agency Action[3]

█ The Defendants admit that no consultation was done with the FWS and argue that no consultation was needed. The Defendants provide financial assistance in the Sierra Vista region in the form of loan repayment guarantees to individuals and small businesses. This includes approving the actual loan and lender and establishing the terms and conditions of the financial assistance provided. In addition, the agencies may change the requirements of their various financial assistance programs.[4] Defendants argue that the financial assistance does not rise to the level of "agency action" and thus the ESA does not apply. *See* 16 U.S.C. § 1536(a)(2). The term "agency action" has been defined very broadly:

> One would be hard pressed to find a statutory provision whose terms were any plainer than those in § 7 of the Endangered Species Act. Its very words affirmatively command all federal agencies "to insure that actions authorized, funded, or carried out by them do not jeopardize the continued existence" of an endangered species or "result in the destruction or modification of habitat of

such species ..." *This language admits no exception.*

*TVA v. Hill,* 437 U.S. 153, 173, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) (emphasis added).

The Ninth Circuit Court of Appeals adopted the reasoning of the Supreme Court in its analysis of agency action. "Following the Supreme Court's lead in *TVA,* we have construed 'agency action' broadly." *Pacific Rivers Council v. Thomas,* 30 F.3d 1050, 1055 (9th Cir.1994).

The regulation defining agency action is 50 C.F.R. § 402.02, which states:

> Action means *all* activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas. Examples include, *but are not limited to:*
>
> (a) actions intended to conserve listed species or their habitat;
>
> (b) the promulgation of regulations;
>
> (c) the granting of licenses, contracts, leases, easements, rights-of-way, permits or grants-in-aid; or
>
> (d) actions directly or indirectly causing modifications to the land, water, or air.

(emphasis added)

"In short, there is little doubt that Congress intended to enact a broad definition of agency action in the ESA ..." *Pacific Rivers,* 30 F.3d at 1054.

However, the reach of the ESA is not boundless. Agencies must have discretion to benefit protected species that fall under the ESA. "Section 7 and the requirements of this part apply to all actions in which there is *discretionary* Federal involvement

---

**3.** Because the standards are so similar, the Court will use "agency action" to indicate agency action under the ESA and "major federal action" under NEPA. *Marbled Murrelet v. Babbitt,* 83 F.3d 1068, 1075 (9th Cir. 1996)

**4.** **HUD:** 12 U.S.C. § 1709; **VA:** 38 U.S.C. § 3702 and 38 U.S.C. § 3703(a)(2)(B); **SBA:** 15 U.S.C. § 634(b)(6) & (7).

or control." 50 C.F.R. § 402.03 (emphasis added); *see also Natural Resources Defense Council v. Houston,* 146 F.3d 1118, 1125–26 (9th Cir.1998) ("Where there is no agency discretion to act, the ESA does not apply")(internal citations omitted). Defendants argue in this case, that pursuant to federal regulations, as agencies they do not have the discretion to take action that would benefit the Umbel or the Flycatcher, *cf.* "[T]here is no further action relevant to the threatened spotted owl that the Bureau of Land Management can take ... [Thus] consultation would be a meaningless exercise; the agency simply does not possess the ability to implement measures that inure to the benefit of the protected species" *Sierra Club v. Babbitt,* 65 F.3d 1502, 1509 (9th Cir.1995). Furthermore, if the agencies have "no ongoing regulatory authority" they are not the entities tasked with decision making and thus would have no discretionary involvement or control. *Washington Toxics Coalition v. Environmental Protection Agency,* 413 F.3d 1024, 1033 (9th Cir.2005).

Plaintiffs take the position that each instance of financial assistance is one that is authorized, funded, or carried out by a federal agency. In addition, they argue that each individual agency does have the discretion to act, in order to benefit the Umbel and the Flycatcher.

As the Ninth Circuit Court of Appeals stated, "[t]he standards for 'major federal action' under NEPA and 'agency action' under the ESA are much the same." *Marbled Murrelet v. Babbitt,* 83 F.3d 1068, 1075 (9th Cir.1996).

"Major Federal Action" includes actions with effects that may be major and which are potentially subject to Federal control and responsibility ... Actions include the circumstance where the responsible officials fail to act and that failure to act is reviewable by courts ...

(a) Actions include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals.

40 C.F.R. § 1508.18.

Plaintiffs argue, as they do in regard to the ESA, that the Defendants are causing indirect effects to the environment by their actions. Indirect effects are those that "are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8.

The Defendants do not directly fund the various projects that are at issue in this case. Rather the Defendants guarantee loans, dispersed to various recipients by private lenders. Therefore, the actual funding by the Defendants is negligible or non-existent. Regardless, federal funding alone is not enough to transform a program into a "major federal action" *Ka Makani,* 295 F.3d at 960. There must be federal "decision-making power, authority, or control over the [Sierra Vista financial assistance program] ... to render it a major federal action." *Id.* In addition, federal approval of a local plan does not become major federal action. *Rattlesnake Coalition v. U.S. Environmental Protection Agency,* 509 F.3d 1095, 1102 (9th Cir. 2007).

Plaintiffs cite *National Wildlife Federation v. FEMA,* 345 F.Supp.2d 1151 (W.D.Wash. 2004), in support of their argument. In *National Wildlife Federation* the court was faced with the question of whether the National Flood Insurance Program ("NFIP") was agency action under the ESA. In holding that it was, the court found that the NFIP was a continuing agency action because not only did the NFIP establish minimum criteria, but it also mapped out the floodplains upon

which the insurance was based, sold the actual flood insurance, and gave discounts to communities that exceeded the minimum criteria established by FEMA. *Id.* at 1171. The court stated that "[the agency actions] have ongoing effects extending beyond their mere approval." *Id.*

In the present case, the Defendants' action stops at approval based on the financial status and needs of the applicant. In the case of the VA, the agency is often not involved in approval at all. Eligible veterans are automatically entitled to the loan guarantees based on their veteran status. 38 U.S.C. § 3702. There is no evidence that the Defendants provide the kind of continuing involvement, or that their actions have any ongoing effect beyond simply approving a person or entity for financial assistance. Moreover, after the loan guarantees have been approved, there is nothing to indicate that the Defendants have any type of ongoing control over the borrower, nor of the property involved.

Furthermore, Congress recognized the extent and special circumstances of federal involvement in floodplain management and codified this in 42 U.S.C.A. § 4002(a)(2) which states:

> The Congress finds that—the availability of Federal loans, grants, guaranties, insurance, and other forms of financial assistance are often determining factors in the utilization of land and the location and construction of public and of private industrial, commercial, and residential facilities.

To this Court, the above statute illustrates why the instant case is distinguishable from cases such as *National Wildlife Federation.* In the instant case, the Defendants' governing statutes say nothing of

environmental protection or discretionary authority over development. To the contrary, the governing statutes, listed in Section I and footnote 4, are statutes of general discretion and specifically address the primary mission of each federal Defendant as it relates to individual veterans, home buyers, or small businesses.

Moreover, the actions of the Defendants do not change the existing state and local restrictions on development. The actions of the Defendants in this case are distinguishable from federal action in cases such as *Lane County Audubon Soc. v. Jamison,* 958 F.2d 290, 293 (9th Cir.1992), in which the federal defendants set annual timber harvests and also determined land use allocation.[5]

■ The Defendants argue that because the lenders are nonfederal actors NEPA should not apply. Nonfederal actors can be involved in a major federal action. The "agency[] [must have] the authority to influence significant nonfederal activity. This influence must be more than the power to give nonbinding advice to the nonfederal actor ... Rather, the federal agency must possess actual power to control the nonfederal activity." *Village of Los Ranchos de Albuquerque v. Barnhart,* 906 F.2d 1477, 1482 (10th Cir.1990) (internal quotation marks and citations omitted). In the present case, the federal Defendants' actual involvement and control stops once the financial assistance is approved.

The Court finds the case of *Ka Makani 'O Kohala Ohana Inc. v. Water Supply,* 295 F.3d 955 (9th Cir.2002), to be instructive. In *Ka Makani* the federal agencies, including HUD, funded preliminary studies in the construction of a water transmis-

---

5. The Defendants cite an unpublished Ninth Circuit Court of Appeals case for the position that the ESA is not triggered if the action taken by the agency does not "alter the legal barriers to development." *Marin Audubon*

*Soc. v. Seidman,* 999 F.2d 543 (9th Cir.1993). However, pursuant to Circuit Rule 36–3 the Court can not rely on this decision as Ninth Circuit Court of Appeals' precedent.

sion system on the Big Island of Hawaii. *Id* at 958. The federal agencies invested $1.3 million in the project but the federal involvement was restricted to preliminary studies and assistance. *Id* at 961. The Ninth Circuit Court of Appeals found that HUD, in particular, did not have discretionary control over "the entire [ ] Project, and therefore [it] was not 'major federal action'." *Id.* In the present case, the federal agencies are involved with guaranteeing loans for individuals and small businesses, yet after the financial assistance is approved their involvement ceases. The federal agencies are not involved in choosing the home for the homeowner or advising the business on which structure to purchase and/or renovate. This Court finds the federal involvement by the Defendant agencies in Sierra Vista development to be marginal. "Marginal federal action will not render otherwise local action federal." *Almond Hill Sch. v. United States Dep't of Agric.*, 768 F.2d 1030, 1039 (9th Cir.1985) (internal quotations and citations omitted).

### D. Agency as Legal Cause of Harm to Species—ESA

■ In the alternative, if the Defendants' actions did rise to the level of agency action under the ESA, the Plaintiffs' argument would still fail because the federal Defendants are not the legal cause of the harm to the listed species. The second step under the ESA is whether or not the federal action is of a kind that "may affect" the listed species or designated critical habitat. 50 C.F.R. § 402. 50 C.F.R. § 402.02 states that actions directly or indirectly causing modifications to the land, water, or air trigger the ESA. Plaintiffs position is that the agencies' actions indirectly harms the Umbel and the Flycatcher by contributing to the draining of the San Pedro River by groundwater pumping. Indirect effects are those "that are caused by the proposed action and are later in

time, but still are reasonably certain to occur." 50 C.F.R. § 402.02.

Whether or not a federal action may affect a listed species is a procedural requirement on the federal agency. 50 C.F.R. § 402.14(a). The federal agency is also tasked with considering the effects of the action as a whole. 50 C.F.R. § 402.14(c). The Defendants do not deny that development in the Sierra Vista region increases the demand for groundwater. Nor do they deny that groundwater pumping may affect endangered species in the SPRNCA. However, the Defendants argue that the financial assistance they provide is too far down the causal chain to be the legal cause of the harm to the Umbel and the Flycatcher.

The Supreme Court has held that "where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect." *Department of Transp. v. Public Citizen*, 541 U.S. 752, 770, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004).

The Defendants argue that they "cannot prevent a certain effect due to [their] limited statutory authority over the relevant actions," *Public Citizen*, 541 U.S. at 770, 124 S.Ct. 2204. Because their governing statutes and regulations do not give them the discretion to consider environmental factors, they argue that they are powerless to prevent harm to the listed species.

In addition, to fall under the definition of indirect effects, the degradation of the San Pedro watershed must not only be "caused" by the proposed action but must also be reasonably certain to occur. Plaintiffs argument fails at the outset as this Court cannot say with any certainty that Defendants' financial assistance programs will cause harm to the listed species or harm that is reasonably likely to occur. 50 C.F.R. § 402.02. The financial assistance

programs at issue here are too attenuated to affect the listed species.

Plaintiffs cite *National Wildlife Federation v. FEMA,* 345 F.Supp.2d 1151 (9th Cir.2004) to support their position. However, as discussed in Section C, *National Wildlife Federation* was a case in which the federal defendants were intimately involved in floodplain management, thus, they had discretionary control over where development occurred, a situation not present in this case.

Plaintiffs also cite *National Wildlife Federation v. Coleman,* 529 F.2d 359 (5th Cir.1976). The federal defendants in *Coleman* financed 90% of an interstate highway project that ran through endangered Sandhill Crane Habitat. *Id.* at 362. The court found that the private and commercial development that would accompany the interstate highway was an indirect effect and thus compliance with the ESA was necessary. *Id.* at 374. This case is also distinguishable, as the direct federal action is *Coleman* clearly affected an "extensive portion" of the critical habitat of the Sandhill Crane. *Id.* In the instant case, not only are the Defendants' actions attenuated in comparison, but there is no allegation that the actual development is in critical habitat.

Thus, this Court finds that the Defendants are not the legal cause of harm to the listed species under the ESA.

### E. Significantly Affecting the Environment—NEPA

■ If the Defendants' actions did rise to the level of major federal action under NEPA, the Plaintiffs' argument would still fail as the Defendants' actions do not significantly affect the environment. Under NEPA, an agency's actions must "significantly affect[ ] the quality of the human environment ..." 42 U.S.C. § 4332(2)(C). There are two factors an agency must look at in order to determine whether its ac-

tions "significantly affect" the environment—"context" and "intensity". 40 C.F.R. § 1508.27. Context refers to the requirement that the "significance of an action must be analyzed in several contexts such as society as a whole, the affected region, the affected interests, and the locality." § 1508.27(a). Intensity "refers to the severity of impact." § 1508.27(b).

Plaintiffs stress the cumulative nature of the drain on the region's water resources. A cumulative impact is "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (federal or non-federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." § 1508.7.

Similar to the Court's analysis of legal cause under the ESA, the Defendants' actions are too attenuated to qualify as significantly affecting the environment. In the context of the San Pedro watershed, the effect of the Defendants' financial assistance in the form of individual loan guarantees is not significant in respect to the effect on the environment. The Defendant agencies do not control where loan guarantees are used by the individual applicants. Similarly, the severity of the impact from the Defendants' financial assistance on the environment is for all practical purposes non-existent. Crucial to both context and severity is the Defendants' actions that are at issue. Local developers and planners are responsible for the number of physical structures that may have an actual effect on the watertable. To find that the Defendants' actions in providing financial assistance violates NEPA, and for that matter the ESA, would stretch both statutory schemes be-

yond what Congress and case law has dictated. Given the Court's ruling, the Court declines to reach Defendants' argument that each agency appropriately provides categorical exclusions that remove their loan assistance programs from NEPA review.

Therefore,

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment is granted and Plaintiffs' Motion for Summary Judgment is denied.

IT IS FURTHER ORDERED that the Clerk of the Court is ordered to close the file on this matter.